921 So.2d 904 (2006)
STATE of Louisiana
v.
Anthony SCOTT.
No. 2004-KA-1312.
Supreme Court of Louisiana.
January 19, 2006.
Rehearing Denied March 10, 2006.
*912 William Martin Sothern, G. Benjamin Cohen, Jelpi Pierre Picou, Jr., R. Neal Walker, New Orleans, for appellant.
Charles C. Foti, Jr., Attorney General, Anthony G. Falterman, District Attorney, Robin Catherine O'Bannon, Assistant District Attorney, Donald David Candell, Assistant Attorney, for appellee.
Paul R. Baier, Amicus Curiae, for The Arc of Louisiana, The Louisiana Psychological Association, The Louisiana Chapter of the AAMR, and The Louisiana Academy of Medical Psychologists
KIMBALL, Justice.
On June 22, 1998, an Assumption Parish grand jury indicted defendant, Anthony Scott, for the June 4, 1998, first degree murders of Jacqueline Guillot Blanchard and Lisa Ann Dupuis. On April 28, 1999, the jury returned a unanimous verdict of *913 guilty as charged. At the conclusion of the penalty phase, the jury unanimously returned the sentence of death after finding the existence of three aggravating circumstances: (1) the offender was engaged in the perpetration or attempted perpetration of armed robbery, (2) the offender knowingly created a risk of death or great bodily harm to more than one person, and (3) the offender was engaged in the perpetration or attempted perpetration of aggravated arson. On direct appeal to this court pursuant to La. Const. art. V, § 5(D), defendant appeals his conviction and death sentence on the basis of 91 assignments of error. For the reasons that follow, we affirm defendant's conviction and remand the matter for a hearing to determine whether defendant is mentally retarded such that he is exempt from the death penalty under the law.[1]

Facts
On June 4, 1998, James Dunn[2] borrowed a small green Pontiac vehicle owned by Avis Rent A Car and rented by Barbara Stewart, and drove to pick up Kendall Breaux[3] and defendant, Anthony Scott. The three men drove from Garyville to the Iberville Bank[4] in Napoleonville.
Lisa Ann Dupuis and Jacqueline Guillot Blanchard were working as bank tellers at the Iberville Bank that morning. At approximately 11:40 a.m., James Dunn, wearing a white baseball cap, and Anthony Scott, wearing a white tee shirt and knee-length blue jeans, entered the bank. A video surveillance camera captured images of the two men as they approached the teller counter and feigned a banking transaction. Ms. Dupuis can be seen filling out a money order while Dunn briefly exited the bank, leaving defendant alone at the teller counter. When Dunn re-entered the bank moments later, he pulled out a 9 mm weapon and aimed it at Ms. Dupuis. Simultaneously, defendant withdrew a large caliber revolver and aimed it at Ms. Blanchard, who was seated at a desk adjacent to the front door in the bank's lobby. Dunn jumped over the teller counter and grabbed Ms. Dupuis. Defendant, still aiming his gun at Ms. Blanchard, forced her to the area behind the teller counter.
The two men removed approximately $16,615.00 from the cash drawers. At gunpoint, defendant and Dunn forced the women into the side office, to the left of the teller counter, where the video equipment was housed.[5] The surveillance cameras peripherally captured some of the activity in the side office, although there were no cameras in that office.
Kendall Breaux then entered the bank carrying a Prestone Anti-Freeze container filled with gasoline. Breaux poured gas throughout the bank, ostensibly to burn *914 the building. However, several unstruck safety matches found on the scene suggest that he did not bring a matchbox with a striking surface to ignite the flammable liquid. The last frame of surveillance footage showed Ms. Blanchard standing just inside the office door, with her hands folded in prayer, as Breaux is strewing gasoline on her desk. At that point, the video equipment was disconnected and the tape went blank.
At this time, a bank customer, Earline Simoneaux, pulled up to the drive-through teller window. She noticed that the blinds were down, but the slats were open. Ms. Simoneaux saw two males running from the side office out of the bank. She testified that after she saw the males run out of the bank and just as she reached for the teller call button, she heard a gunshot. She pulled her arm back into her vehicle and heard two more gunshots. She next saw a third male wearing a white baseball cap run out of the bank, glancing at her as he got into the green car with the other two men. Simoneaux attempted to follow the three men in the green car, but then returned to give her statement the police officers she had seen arrive at the bank.
Assumption Parish Sheriff's Deputy Michael Brown responded to the hold-up alarm at the bank and drove into the bank parking lot as the green car was leaving. Brown entered the front door, announced his presence, and smelled a strong odor of gasoline emitting from the bank. He received no response from the tellers, but heard a gasping sound coming from the side office. Brown saw both tellers lying in pools of blood, and ascertained that Lisa Dupuis was dead on the scene, but that Jackie Blanchard was gasping for breath. Brown radioed for backup and an ambulance. Brown also gave a description of the green car, which was the last car he had seen exiting the bank, and asked that officers be on the lookout for the green car occupied by three black males. Acadian Ambulance arrived and began life-saving measures on Ms. Blanchard; however, she died en route to the hospital. Each woman had been shot three times.
Roadblocks were set up throughout the area, and the three males drove the green vehicle through one of the roadblocks at a high rate of speed. Seconds later, the green vehicle rounded a blind curve and collided headlong with a train that was passing on tracks perpendicular to the highway. The green car, now completely disabled, was carried some distance by the train before coming to a stop. Uninjured, defendant and Dunn exited the front of the vehicle, and fled on foot, each with a gun in hand, escaping under a train trestle. Breaux attempted to escape, but was arrested as he fled from the vehicle. Bank bags containing bundles of money bearing the "I.B." wrappers were found in the car, and loose currency spilled out of the car. The bank's "bait money" was recovered from the vehicle. Breaux also had a quantity of cash on his person. Inside the car, the officers seized the bank's VCR equipment, including the surveillance tape. In addition, the officers seized a white tee shirt stained with blood from the passenger seat and a white baseball cap from the driver's side floorboard.
Defendant and Dunn were captured a short time later in a nearby sugar cane field. When he was arrested, ten $100 dollar bills and seven $50 dollar bills were removed from defendant's person. Subsequently, a large sum of cash was seized from the cane field. A revolver was found in the grass off the highway near the railroad tracks, and a handgun was recovered from the sugar cane field. Ultimately, it was determined that slightly over $16,000.00 was stolen from the bank, and *915 slightly over $16,000.00 was recovered from the crash scene, the persons of defendant and Breaux, and the cane field.

Pre-Trial Issues

Assignments of Error 1-5
On appeal, defendant contends he was improperly tried and convicted despite the unresolved issue of his mental capacity to proceed. Alternatively, by separate motion to this court, defendant asks that the trial judge be ordered to provide a per curiam clarifying whether defendant's capacity was determined. However, the record clearly shows that no question of defendant's capacity to proceed was ever raised by the defense, the state, or the trial court. Additionally, the record contains the opinions of the two members of the sanity commission who agree that defendant was competent to proceed. For these reasons, discussed in greater detail below, these assignments of error are without merit.
Following the defendant's plea of not guilty by reason of insanity on July 14, 1998, the state filed a motion on October 12, 1998, for the appointment of a sanity commission. On October 14, 1998, the trial court in accordance with Code of Criminal Procedure article 650 appointed Dr. F.A. Silva and Dr. Charles Vosburg to assess defendant's mental condition at the time of the murders. Defense counsel sought to vacate this order contending that defendant might make incriminatory statements to the examiners. The state contended and the trial court ruled that defendant had raised the issue of defendant's mental state at the time of the offense with the plea of not guilty by reason of insanity and that the appointment of a sanity commission was warranted. Neither the order appointing the sanity commission, nor the transcripts of the hearings surrounding this disputed order, nor the trial judge's ruling contains any indication that defendant's competency to proceed was ever properly raised or reasonably doubted.
Although the trial court's order instructed the sanity commission to report on defendant's mental state at the time of the murders, both experts also investigated and reported on defendant's capacity to proceed. In his March 29, 1999 report, Dr. Silva indicated that in his opinion the defendant understood the charges against him and could assist defense counsel and participate in the trial. In his April 5, 1999 report, Dr. Vosburg stated that the defendant tested as competent to proceed on the Georgia Court Competency Test.
La.C.Cr.P. art. 642 provides: "The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed." Article 650 provides in part: "When a defendant enters a combined plea of `not guilty and not guilty by reason of insanity,' the court may appoint a sanity commission as provided in Article 644 to make an examination as to the defendant's mental condition at the time of the offense. The court may also order the commission to make an examination as to the defendant's present mental capacity to proceed." The plain language of the trial court's order as well as the transcripts of the hearings surrounding it show that the trial court exercised its discretion under article 650 to appoint a sanity commission to determine the defendant's mental condition at the time of the offense. There is nothing in this record to suggest that the defense, the state, or the trial court raised defendant's mental incapacity *916 to proceed triggering the protection of article 642.
Instead, the members of the sanity commission expanded the scope of their inquiry beyond a determination of defendant's mental state at the time of the offense to include an investigation of defendant's competency. This action by the members of the sanity commission, however, cannot be considered to have raised a reasonable ground to doubt defendant's capacity to proceed. In fact, it was the opinion of both experts that the defendant was competent. Accordingly, these assignments of error are without merit.

Assignment of Errors 6-8
In these assignments of error, defendant avers that the removal of his appointed counsel unconstitutionally interfered with the attorney-client relationship and violated his right to counsel of choice.
Both the state and federal constitutions guarantee a defendant's right to the assistance of counsel. Louisiana Const. art. I, § 13 provides in relevant part: "At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment." The Sixth Amendment to the United States Constitution likewise carries such a guarantee. Although the Sixth Amendment primarily guarantees the right to effective counsel, it also includes the right to select and be represented by counsel of choice. Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 1696, 100 L.Ed.2d 140 (1988); Powell v. Alabama, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932) (stating unequivocally, "[i]t is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."). The right to counsel of choice, however, is not absolute. In State v. Harper, 381 So.2d 468 (La.1980), this court stated:
As a general proposition a person accused in a criminal trial has the right to counsel of his choice. State v. Leggett, 363 So.2d 434 (La.1978); State v. Mackie, 352 So.2d 1297 (La.1977); State v. Anthony, 347 So.2d 483 (La.1977). If a defendant is indigent he has the right to court appointed counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Argersinger v. Hamlin, [407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972)]; State v. Adams, 369 So.2d 1327 (La.1979); City of Baton Rouge v. Dees, 363 So.2d 530 (La.1978). An indigent defendant does not have the right to have a particular attorney appointed to represent him. State v. Rideau, 278 So.2d 100 (La.1973). An indigent's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. State v. Jones, 376 So.2d 125 (La.1979); State v. Leggett, supra; State v. Mackie, supra.

Harper, 381 So.2d at 470-71. As this court has also explained, "The right of defendant to counsel of his choice must be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system of which it is a part." State v. Lee, 364 So.2d 1024, 1028 (La.1978).
The question of withdrawal of counsel largely rests with the discretion of the trial judge, and his ruling will not be disturbed in the absence of a clear showing of abuse of discretion. State v. Brown, 03-0897, p. 15 (La.4/12/05), 907 So.2d 1, 14; State v. Cousin, 307 So.2d 326, 328 (La. *917 1975); State v. Boudoin, 257 La. 583, 588-89, 243 So.2d 265, 267 (1971).
In the present case, the trial court appointed Susan Jones as lead counsel to represent defendant on June 15, 1998. Subsequently, Ms. Jones filed a motion to appoint Jack Leary as second chair in the instant capital case, which the district court approved. On March 3, 1999, defendant sent a handwritten letter to the district judge, informing him that he did not want Mr. Leary removed from his case, that he did not trust Ms. Jones, and that if a lawyer had to be removed from his case, he would choose to have Ms. Jones removed. The next day, Ms. Jones signed a Motion and Order to Substitute Counsel of Record stating it was necessary to substitute Joslyn Alex in place of Mr. Leary to assist her in representing defendant. On March 5, 1999, the district court signed an order substituting Ms. Alex for Mr. Leary as associate counsel.[6] On March 8, 1999, Mr. Leary filed a Contradictory Motion seeking to substitute Michael L. Thiel for Ms. Jones as lead counsel and to vacate the previously signed order substituting Ms. Alex for Mr. Leary as associate counsel. The motion alleged that Ms. Jones and defendant were unable to communicate with one another and that because defendant felt Ms. Jones did not allow him to give input toward shaping his defense, defendant shared vital information with Mr. Leary that had direct bearing and impact on his guilt. The motion further stated that defendant refused to share this vital information with Ms. Jones and that Mr. Leary similarly did not share this information with her "simply because he had no idea that an attempt was going to be made to remove him as counsel."
On March 17, 1999, approximately one month before the scheduled trial date, the district court held a contradictory hearing on Mr. Leary's motion at which defendant was present. At the outset, the district court expressed its dissatisfaction because the attorney Mr. Leary was seeking to have appointed, Mr. Thiel, was not present at the hearing. The court noted that Mr. Leary was being relieved as counsel of record, and defendant asked the court for an explanation as follows:
The Defendant: Why was she just taking him off the case, and that's my lawyer too. Why's she hiding things 
The Court: Let me ask you, can you afford to hire your own counsel?
The Defendant: I know what you're saying. No, I can't afford no lawyer.
The Court: If you can't afford an attorney, you don't pick the attorneys that defend you. An attorney has been appointed for you. Now, if you can afford your own attorney, you can hire your own attorney. You have that right.
But if you cannot afford an attorney, you cannot dictate to this Court or anyone else as to what attorney is going to defend you in this case.
Defendant then opined that Ms. Jones did not understand him, prompting the following colloquy with the court:
The Court: What have you told her that bothered you or that she has not done so far as your defense is concerned? You say she doesn't understand you, what you say 
The Defendant: I'm saying to prove my innocence, it's irrelevant to her.
The Court: One thing that the Court has noticed is that Ms. Jones has filed several motions on your behalf; as a matter of fact, one of the motions that she filed was a Motion for a Change of *918 Venue, which she successfully argued before this Court and the Court granted the change in venue for jury selection....
* * *
The Defendant: I want you to understand that I'm not prejudiced. I'm not saying that because she's that color or this color, or nothing. I'm speaking of that of my own. I'm not prejudiced.
The Court: When did you become dissatisfied with Ms. Jones?
The Defendant: A long time ago. When I tell her something about my innocence 
The Court: Okay. Why didn't you bring that to the Court's attention? Why was it when Mr. Leary evidently talked to you that you decided to bring this to the Court's attention? ...
The court then asked Ms. Jones about any problems between her and defendant:
Ms. Jones: In the very beginning, Judge, we had a little trouble when we first met each other; but after that, we didn't have any problems. I went over there and spoke with him and various experts and we didn't have any problems until the Monday of the hearing when Mr. Leary had been to see him the Thursday before. And then all of a sudden, he wouldn't talk to me, he wouldn't talk to my experts, and that's when I saw the problems started arising, Your Honor.
Mr. Leary: Your Honor, when I went to see Mr. Scott, he was bursting over with dissatisfaction. My first thing ... to him was, somebody is going to think I'm putting this in your head.
I've not said anything bad against Susan, never said anything bad against Susan. He was overflowing with the things that he felt he couldn't tell her  that he was unhappy from the beginning, that he was sick of her, that she wouldn't listen to him, that nobody was concerned about his viewpoints. I kept telling Anthony then that Susan was a good lawyer....
Ms. Jones: It was the Thursday  the hearing was February 22, and so it was the Thursday before that Mr. Leary went to see Mr. Scott and it was at that hearing on the 22nd that he didn't want to talk to me.
Mr. Leary: When he spoke to me about his discontent, I didn't say anything about Ms. Jones. When we had the meeting together, Mr. Petit, Ms. Jones and myself went in to see Mr. Scott, I told her then because I could see it in her face, she was thinking that I planted some seeds in Anthony's head, which I didn't. I expressed to her I did not. That Mr. Scott and I had a pleasant conversation and then she said herself, he doesn't like me.
I said, I didn't plant anything, Susan. If this is the way the man feels, this is the way the man's been feeling. This is not anything new.
Ms. Jones: Your Honor, just one other point. I'm recalling from the motion that Mr. Leary filed about this information that Mr. Scott provided him. He never at any time provided that information to me. He's telling the Court now that this information has been since that Thursday meeting  which was February 19 or 20  and he has never since then provided me with that information concerning this case, Your Honor.
Mr. Leary: I had no idea that we were going to be into this ruckus, Judge. I didn't view it as withholding anything. Mr. Scott has deep seated feelings and I had full intentions to speak with Susan about this. I've called her several times. She's been out of town and she hasn't *919 returned any phone calls, so I didn't anticipate that I was going  that there was going to be any lapse in communications between Ms. Jones and I until Mr. Petit shows up and gives me this bombshell which surprised me.
And when I said "overflowing with information," Susan, I wasn't exactly saying he was bubbling with all that then. That came out in the course of conversations.
Ms. Jones then informed the court that she was prepared to go to trial on April 19. The court asked defendant whether his only dissatisfaction with Ms. Jones was his feeling that she did not understand him. Defendant replied that when he said things that could prove his innocence, Ms. Jones did not want to hear him. Ms. Jones added that after Ms. Alex was enrolled as co-counsel, they had a meeting with defendant wherein he spoke about Mr. Leary for the first five minutes, but after that they didn't have any problems. Ms. Alex stated that at the meeting she initially noticed defendant was very angry and there were "some issues of trust that developed." However, she claimed that after she and Ms. Jones addressed the particular issues defendant was concerned about, defendant indicated that he was willing to work with them. Defendant disputed Ms. Alex's statements, stating, "they're putting words in my mouth."
The hearing concluded with the following statements and ruling:
Mr. Leary: I think this is quite clear. I would think that the Court would consider the gravity of the conflict between counsel and the defendant as opposed to judicial economy in trying to remain on a time line 
The Court: Let me cut this off right now before I hold you in contempt. The Court is not concerned with necessarily a time line. The Court feels that really you're bordering on ethical violations so far as I'm concerned in your supposed representation of this particular defendant. The Court will make this particular observation. Ms. Jones, so far as this Court is concerned, has adequately filed all of the necessary motions and has gone beyond the call of duty so far as helping this defendant prepare a defense so far as the case scheduled for April 19. The Court has noted that even in the Dunn trial, which the Court conducted jury selection in Lake Charles last week, that Ms. Jones and Ms. Alex appeared in Lake Charles for the purpose of looking at voir dire, for whatever reason, for trial strategies so far as voir dire is concerned and maybe to address what mode of operation the prosecution has so far as jury selection is concerned. Mr. Leary, I didn't see you over there in 
Mr. Leary: Your Honor, I would've been there 
The Court: Hold on. Don't interrupt me. Don't interrupt me. Okay.
The Court's decision is this. The jury selection in this matter is scheduled for April 19 in Caddo Parish. We're looking at taking testimony starting on April 26. The Court, counsel for the State and counsel for the defense has gone through considerable steps in setting this trial date and obtained facilities after granting the change of venue. As stated before, the Court sees nothing deficient so far as Ms. Jones's representation of this particular defendant. Numerous discovery motions and other motions have been filed by counsel. The Court rules that this defendant must exercise his right to counsel of his choice at a reasonable time and in a reasonable manner, and in an appropriate phase of the proceedings, absent a justifiable basis. And I find none here. There's no *920 constitutional right to make a new choice of counsel at this late date that would necessitate a continuance and disrupt the orderly and speedy disposition of this matter. That's the Court's ruling.
In this case, the district court's ruling is fully supported by the law and we find no abuse of discretion in its decision to retain Ms. Jones and to substitute Ms. Alex for Mr. Leary. This court has consistently held that a defendant's right to counsel of his choice cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice. State v. Bridgewater, 00-1529, pp. 20-21 (La.1/15/02), 823 So.2d 877, 896; State v. Seiss, 428 So.2d 444, 447 (La.1983); State v. Champion, 412 So.2d 1048, 1050 (La. 1982). Additionally, this court has clearly stated that the district court cannot be required to appoint different counsel "merely to please the desires of the indigent accused, in the absence of a showing that the court appointed attorney is inept or incompetent to represent the accused." State v. White, 256 La. 36, 42, 235 So.2d 84, 86 (1970).
Reading the transcript of the hearing as a whole, it is apparent that the relationship between Ms. Jones and Mr. Leary deteriorated into one characterized by acrimony and ill will. The record makes it clear that Ms. Jones and Mr. Leary could not work together to represent defendant. This is evidenced by the fact that Mr. Leary was told what he believed to be "vital information" by defendant, but Mr. Leary did not share this information with defendant's lead counsel.
Under the circumstances presented, we do not believe the district court abused its discretion when it chose to substitute Ms. Alex for Mr. Leary as associate counsel. In our view, it was reasonable for the district court to retain Ms. Jones as lead counsel and to substitute associate counsel when the issue arose approximately one month before the trial date. This is especially true in view of the consistent jurisprudence cited above holding that an indigent defendant does not have the right to choose his appointed counsel. The district court specifically found that Ms. Jones had filed all the necessary motions for defendant's defense, including a successful motion for a change of venue, and had "gone beyond the call of duty" in her representation of defendant. While one might question the ex parte manner in which it appears the substitution of associate counsel was made, we note the trial court had benefit of defendant's letter expressing his desire that Mr. Leary remain on his case, and was therefore aware of defendant's position on the issue before it ordered the substitution of associate counsel. Additionally, defendant's presence was not required under the provisions of La.C.Cr.P. art. 831.[7] Finally, defendant *921 was present at the hearing on Mr. Leary's motion to substitute lead counsel and to vacate the order substituting Ms. Alex for Mr. Leary. For all these reasons, we find no interference with the attorney-client relationship and no violation of defendant's right to counsel of choice. These assignments of error lack merit.

Voir Dire Issues

Assignments of Error 9-18, 30-38
In these assignments of error, defendant complains that the district court erroneously denied 15 defense challenges for cause. Defendant asserts that he was forced to use 11 peremptory challenges for jurors who should have been removed for cause, resulting in a premature exhaustion of his peremptory challenges. Thus, he claims he was forced to accept five jurors who were not fit to serve.
The grounds for which a juror may be challenged for cause are set forth in La. C.Cr.P. art. 797. Two of these grounds are pertinent here, namely that "[t]he juror is not impartial, whatever the cause of his partiality,"[8] and "[t]he juror will not accept the law as given to him by the court." La.C.Cr.P. art. 797(2) and (4).
A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686; State v. Robertson, 92-2660, p. 4 (La.1/14/94), 630 So.2d 1278, 1281. Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges. Robertson, 92-2660 at p. 3, 630 So.2d at 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). An erroneous ruling depriving an accused of a peremptory challenge is a substantial violation of his constitutional and statutory rights and constitutes reversible error. Cross, 93-1189 at p. 6, 658 So.2d at 686; State v. Bourque, 622 So.2d 198, 225 (La. 1993). "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Jones, 474 So.2d 919, 926 (La.1985). However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on the ground he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Robertson, 92-2660 at p. 4, 630 So.2d at 1281.
To prove there has been error warranting reversal of a conviction, defendant is only required to show: (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. Robertson, 92-2660 at p. 3, 630 So.2d at 1281. In the instant case, it is *922 undisputed that defendant exhausted his peremptory challenges, and, therefore, need only show that the trial court abused its discretion by denying a challenge for cause.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd. on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the U.S. Supreme Court held that a prospective juror who would vote automatically for a life sentence was properly excluded by the trial court. This standard, as clarified by Witt, is incorporated in La.C.Cr.P. art. 798(2)(a) and (b).[9]State v. Manning, 03-1982, p. 38 (La.10/19/04), 885 So.2d 1044, 1082. In a "reverse-Witherspoon" context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him...." Robertson, 92-2660 at p. 8, 630 So.2d at 1284.[10] Jurors who cannot consider both a life sentence and a death sentence are "not impartial" and cannot "accept the law as given ... by the court." La.C.Cr.P. art. 797(2),(4); Carmouche, 01-0405, p. 11 (La.5/14/02), 872 So.2d 1020, 1030. Stated another way, if a potential juror's views on the death penalty are such that they would prevent or substantially impair the performance of his duties in accordance with his instructions or oaths, whether those views are for or against the death penalty, he should be excused for cause. Id.

A. Juror James Butler
Defendant avers that the district court erroneously denied the challenge for cause as to prospective juror James Butler because he made clear that "anyone who shoots and kills another person should receive the death penalty."
A review of Mr. Butler's voir dire as a whole indicates that he was questioned in *923 the first panel. In response to the trial court's preliminary inquiries, Butler stated he had no general opposition to the death penalty, and agreed to follow the law as given and to render a verdict according to the facts. He affirmed that as an individual juror he could impose the death penalty. When he was asked if he would do so automatically, his initial response, after asking what the judge meant by "automatically," was, "I imagine, yes." When the judge delved into whether he would consider the mitigating circumstances and evidence presented at the second phase of the trial, Mr. Butler stated, "I may consider it. I couldn't tell you for sure." The discussion continued as follows:
The Court: I will tell you that in my instructions, if you are selected as a juror, I will tell you that you must consider those mitigating circumstances. So the question would be, would you follow my instructions to you?
Mr. Butler: Yes.
The Court: Are there circumstances under which you would not impose the death penalty?
Mr. Butler: I'm not sure.
Mr. Butler agreed with the State that it is possible to fake mental illness. When the prosecutor asked him if he would still be able to consider the death penalty if "life meant life," he acknowledged that he could. The State then asked him about mitigation:
Ms. O'Bannon: Is there any one particular mitigating factor that would so outweigh everything else that sitting here you could say, if I heard this ... I would never vote for the death penalty?
Mr. Butler: Probably not.
Ms. O'Bannon: Would it just depend on the circumstances of the crime?
Mr. Butler: If somebody shoots and kills somebody, I feel they should have the death penalty.
Ms. O'Bannon: Would you be able to follow the law if the Judge said you must consider the mitigating circumstances before making that decision; can you do that?
Mr. Butler: I probably can, but it would probably be weighted towards my feelings.
Ms. O'Bannon: No one is asking you to state your beliefs, but the law wants you to be able to say, I will listen to everything. After I hear it, I will decide how much weight I will give it.
I'm not asking you and no one else will say, tell me right now, this is the evidence you will hear, and tell me now what weight you will give it. You cannot do that. We need to know that you will be open mined [sic] and be able to listen to all of the evidence before making that final decision. Can you do that?
Mr. Butler: Yes.
Under defense questioning, Mr. Butler felt that the law of principals would make all actors "equally responsible." He indicated that he would "probably not" be swayed by sympathy for families on either side of the case. He felt that in deliberation he would be able to hold to his beliefs. When asked to explain his perception of mental retardation, Mr. Butler stated that the person "may not know the difference between right and wrong." Returning to Mr. Butler's views on the death penalty, the following discussion ensued:
Ms. Jones: Mr. Butler, you said, and correct me if I'm wrong, that you weren't sure that you would not give the death penalty; is that correct?
Mr. Butler: I don't know.
Ms. Jones: ... I think you said that you couldn't tell for sure whether or not you *924 would consider the mitigating circumstance; am I correct?
Mr. Butler: I think I said if somebody was involved in a murder that I would ask for the death penalty.
Ms. Jones: Well, he's accused, Anthony, of first degree murder. So I can guarantee you one thing, if you come back with guilty as charged of first degree murder, you will find that he intentionally killed someone or intentionally committed, you know, with the intent to commit great bodily harm. You're going to find that. You will not come back and say, okay let's try that part over. Okay? You're going to find that he had the specific intent. It's a murder.
So, given those circumstances, you already found that, we can't put that out of our mind  that's first degree murder. Wouldn't you agree then, that you would give the death penalty from what you're telling me?
Mr. Butler: Yes.
Ms. Jones: And there's nothing that I can say or anything that will come up that would change your mind?
Mr. Butler: No.
For clarification, the court again queried Mr. Butler:
The Court: ... Mr. Butler, the question was asked to you about the imposition of the death penalty. Once you have found in the guilt phase that the defendant had the specific intent, the question is, once you have found that at the guilt phase, would you consider the mitigating circumstances in the penalty phase prior to making a decision as to death or life imprisonment? Or would you automatically say after the guilt phase that it's death?
Mr. Butler: No. That isn't how it was asked.
The Court: I understand, and that's why I'm asking.
Mr. Butler: Yes, I would consider that.
The Court: You would consider the mitigating circumstances prior to making a decision as to death or life imprisonment?
Mr. Butler: Yes, sir, I would.
Mr. Butler conceded that he may have a problem maintaining his convictions if his beliefs are different from the other jurors. He did not feel he could consider mercy. When asked whether he would consider youth as a reason not to give the death penalty, Mr. Butler responded, "Youth is defined as under 18; so, yes, I would."
Defense counsel challenged Mr. Butler for cause, based on his belief that he may automatically impose the death penalty, and that he could not consider the mitigating circumstances. The trial court found that Mr. Butler could follow the law and would consider all of the mitigating circumstances, and denied the challenge for cause. Thereafter, defense counsel exercised a peremptory challenge to excuse Mr. Butler.
Subsequently, after the State raised a Batson challenge to the defendant's use of his peremptory challenges, the court ordered defendant to go back and justify his use of certain peremptory challenges. As to Mr. Butler, defense counsel offered that he was "death prone," that he may automatically impose the death penalty, and that he may not consider the mitigating circumstances. Defense counsel continued:
Ms. Jones: [I]n addition to that, he's a white male, age 58 who lives in [a] predominantly white area and we also felt that his  I felt when I questioned him as his attitude towards us was not pleasant, especially towards myself and we, of course, know how a juror's attitude to-wards *925 an attorney can affect the attitude towards the client. And those are the reasons why we challenged him for cause.
Ms. O'Bannon: Your Honor, she just gave a reason why she cut him and it was based on race  that he was white and lived in a white neighborhood. That's what she just said  he's [a] white male that lives in [a] predominantly white neighborhood. That's not that race neutral reasons.
He was a very quite [sic] man, answered the questions, open-minded, he showed no hostility to anyone, and she sits here and said the reasons she cut him was because he's white. That's the whole basis of a Batson.
The court found counsel's stated reasons were not race-neutral, and that Mr. Butler would not automatically impose death, but would consider the mitigating circumstances. Consequently, the court ordered that Mr. Butler be seated as a juror.
As a whole, Mr. Butler's answers indicate that he would abide by the law. He stated more than once that he would consider the mitigating circumstances prior to determining whether to impose a sentence of death. While Mr. Butler appears predisposed to the death penalty, he did state he would consider mitigating circumstances. This court has upheld denials of challenges for cause in such situations. See State v. Broaden, 99-2124, pp. 11-12 (La.2/21/01), 780 So.2d 349, 358, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (cause challenge properly denied for juror who was not unwilling to consider a life sentence and would not automatically vote for the death penalty); State v. Miller, 99-0192, pp. 18-19 (La.9/6/00), 776 So.2d 396, 408, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001) (prospective jurors who expressly agree to consider both life and death sentences and to consider any mitigating evidence are not properly excused for cause); State v. Lucky, 96-1687, p. 6 (4/13/99), 755 So.2d 845, 850, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000) (denial of cause challenge upheld for juror who stated that he was predisposed to the death penalty and that the mitigating evidence would have to be substantial for juror to recommend life sentence); State v. Chester, 97-2790, p. 14 (La.12/1/98), 724 So.2d 1276, 1285, cert. denied, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999) (no abuse of discretion for denying cause challenge for juror who stated that "in an appropriate case" she could return a life sentence); State v. Hart, 96-0697, pp. 7-10 (La.3/7/97), 691 So.2d 651, 656-58 (approving denial of cause challenge against juror who believed that the death penalty for an intentional killing "ought to be the law," but agreed to abide by the judge's instructions and to consider both life and death sentences). That a juror has a personal preference for the death penalty does not render him unfit for service on a capital jury if he indicates he would not automatically vote for the death penalty and could consider both aggravating and mitigating circumstances in reaching a sentencing verdict on the basis of the evidence presented at trial. State v. Higgins, 03-1980, pp. 30-31 (La.4/1/05), 898 So.2d 1219, 1238-39; State v. Lucky, 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850.
This court has stated that "[a] trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, even when the juror has voiced an opinion seemingly prejudicial to the defense, if the juror, on further inquiry or instruction, demonstrates a willingness and ability to decide the case impartially according to the law and evidence." Lucky, 96-1687 at p. 6, 755 So.2d at 850. In the instant case, *926 Mr. Butler did not demonstrate "an unconditional willingness to impose a death penalty under any and all circumstances." See State v. Dunn, 01-1635, p. 17 (La.11/1/02), 831 So.2d 862, 876 (quoting State v. Chester, 97-2790, p. 15 (La.12/1/98), 724 So.2d 1276, 1285-86). Here, the trial court determined that Mr. Butler could be fair and consider mitigating circumstances. On this record, we cannot say the trial court abused its discretion in denying the challenge for cause as to Mr. Butler. This argument lacks merit.

B. Albert Rettenmair
Defendant asserts that Albert Rettenmair, called in the second panel, should have been excluded for cause based on his view that the death penalty should be automatically imposed after a finding of guilty of first degree murder. Defendant further claims that Mr. Rettenmair rejected youth as a mitigating circumstance, and that he was biased in favor of law enforcement.
A review of Mr. Rettenmair's voir dire response as a whole reveals that he was questioned in the second panel. Responding to initial questioning by the district court, Mr. Rettenmair stated that he would not automatically vote to impose the death penalty and that he would consider all the mitigating circumstances prior to making a decision as to the appropriate penalty. Pursuant to questioning by the State, Mr. Rettenmair reassured the prosecutor that he would consider all the mitigating evidence and apply the appropriate weight. He further affirmed that he would not walk into the penalty phase with a pre-determined outcome, and the fact that "life meant life" would not substantially impair his ability to vote for the death penalty. He reiterated that he would not vote automatically for the death penalty.
Mr. Rettenmair explained to defense counsel that his job as a customs inspector is to protect the United States from importation of prohibited merchandise or contraband, and to collect revenue. He has had gun training similar to police training and occasionally has law enforcement training. He considers himself law enforcement.
Mr. Rettenmair told defense counsel he could not think of a circumstance where he would not impose the death penalty after finding a defendant guilty of first degree murder. He stated that a 14- or 15-year old knows the difference between right and wrong, and he would impose the death penalty if someone of that age was guilty of first degree murder.
During the selection process, the defense moved to challenge Mr. Rettenmair for cause based on his occupation in law enforcement, which the trial court denied. Defense counsel then added that the cause challenge should be granted because Mr. Rettenmair stated he could not think of any circumstances where he could not impose the death penalty. The court again denied the challenge for cause. Thereafter, both sides accepted Mr. Rettenmair as a juror. However, the defense later back-struck Mr. Rettenmair peremptorily, citing his occupation in law enforcement as the basis under Batson. The trial court accepted the reason as race-neutral and allowed Mr. Rettenmair to be removed.
La.C.Cr.P. art. 797 provides in pertinent part that the defendant may challenge a juror for cause on the ground that:
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude *927 that it would influence the juror in arriving at a verdict[.]
There is no per se bar to members of law enforcement serving as criminal jurors. In State v. Ballard, 98-2198 (La.10/19/99), 747 So.2d 1077, this court explicitly overruled State v. Simmons, 390 So.2d 1317 (La.1980), and held that if a law enforcement officer indicates during voir dire that he could be an impartial juror, the trial court has the discretion to determine whether or not a cause challenge is warranted. This court has otherwise long held that mere association with law enforcement personnel does not provide grounds for a cause challenge. See, e.g., State v. Comeaux, 514 So.2d 84, 95 (La. 1987) (civilian employee working as a police dispatcher not disqualified to serve); State v. Chapman, 410 So.2d 689, 711 (La. 1982) (retired jailer not disqualified from service in a criminal case because he was a custodian and administrator and not engaged in active law enforcement). In any event, "[n]ot every predisposition or leaning in any direction rises to the level of substantial impairment." State v. Lucky, 96-1687at p. 7 (La.4/13/99), 755 So.2d 845, 851.
Here, Mr. Rettenmair's employment as a customs agent did not support a valid cause challenge. He made it clear that he would take all the facts into consideration before making his decision. The fact that he could not come up with any circumstances where he would not impose the death penalty other than those of "accident and self-defense" does not require the trial court to excuse him for cause. Nothing Mr. Rettenmair said indicates that he would not consider mitigating circumstances or that his personal views would substantially impair him in his duty to follow the law. Considering the totality of Mr. Rettenmair's responses which formed the basis of defense counsel's cause challenge, no abuse of discretion is apparent in the trial court's denial of that challenge.

C. Calvin Stainbrook
Defendant urges that the trial court erred in denying the challenge for cause as to Calvin Stainbrook because Mr. Stainbrook indicated he would not require the State to prove specific intent to convict defendant of first degree murder. Defendant further claims that Mr. Stainbrook would not consider a life sentence, and would not consider any relevant mitigating evidence.
A review of Mr. Stainbrook's voir dire responses as a whole reveals that he was called in panel two. In response to the trial court's initial questioning, Mr. Stainbrook stated that he had no general opposition to the death penalty, could impose the death penalty as an individual juror, would not automatically vote to impose the death penalty, and while he could not think of any circumstances in which he would not impose the death penalty, he would consider all the mitigating circumstances prior to making a decision regarding the appropriate penalty. Answering the prosecutor's questions, Mr. Stainbrook agreed that he would have to hear everything before making his decision, and would give the mitigating circumstances the appropriate weight. He reiterated that with respect to mitigation, "I could consider all of them, what weight I gave would be my problem." When the prosecutor agreed and repeated, "You have to be able to consider it," Mr. Stainbrook again stated, "I can consider it."
During a general discussion about principals, defense counsel queried, "Is there any situation where you would find that one person is less culpable than the others?" Mr. Stainbrook replied, "No." Defense counsel continued, "Is there a situation where maybe they went into do one *928 particular thing and somebody decides to do something else?" Mr. Stainbrook answered, "If they do that and something is done, they are all guilty. All take the heat."
The lead counsel for the defense then posed a few questions:
Ms. Jones: Mr. Stainbrook, ... [i]t's my understanding that you said that there was no circumstance where you would not impose the death penalty.
Mr. Stainbrook: I don't think so.
Ms. Jones: You don't think you said that or there were no circumstances 
Mr. Stainbrook: I just don't think there's any circumstances.
* * *
Ms. Jones: So, in general, as you understand, finish the first phase, and you say, yeah, Anthony is guilty.
Mr. Stainbrook: That's correct, okay.
Ms. Jones: What that's saying is, is that he had the specific intent to kill or to inflict great bodily harm.
Mr. Stainbrook: Yes. Right.
Ms. Jones: He meant to do what he did. And at that point, you decide penalty.
So, you cannot consider any circumstance?
Mr. Stainbrook: Wait a minute. You got to consider what the Judge was saying about the circumstances after that.
Ms. Jones: That's what I'm asking.
Mr. Stainbrook: I have to do that; but as far as that goes, I can't think of any others. There's stuff like children, I don't go for that stuff.
Ms. Jones: You don't go for like when they talked about the youth.
Mr. Stainbrook: No, that doesn't cut it with me.
Mr. Jones: Okay.... We may say, yes, Judge, and the Judge phrased it the best. You can say, yes, Judge, I will follow what you say. I'm going to consider these mitigating circumstances, but am I really going to consider them[?] Am I going to consider them?
Mr. Stainbrook: I may consider them, but from then on, it's my responsibility. Is that correct?
* * *
Ms. Jones: One of the mitigating circumstances that he read and he hasn't read it for a while, but one [of] them is the youth of offender at the time of offense. Did you just say that 
Mr. Stainbrook: To me, you know, I will listen to it; but in my heart, that's not going to cut it.... I'd probably think about it....
Defense counsel challenged Mr. Stainbrook for cause on the basis of his response that all principals share equally in the guilt, which counsel interpreted to mean that he would not require the State to prove specific intent. Counsel also felt that Mr. Stainbrook articulated no mitigating circumstances under which he would not impose the death penalty. On the other hand, the prosecutor pointed out that Mr. Stainbrook promised to keep an open mind, that he would consider all mitigating evidence and then decide what weight was appropriate. The court denied the challenge for cause finding that the totality of Mr. Stainbrook's responses were unbiased. Thereafter, defendant's counsel used a peremptory challenge to excuse Stainbrook.
Our review of Mr. Stainbrook's responses reveal that nothing he said indicated he would not require the State to prove specific intent to convict defendant of first degree murder. Additionally, this court has previously stated that "[b]y deliberate *929 choice, Louisiana does not provide any standard for a juror to weigh mitigating circumstances against aggravating circumstances." Lucky, 96-1687 at p. 6, 755 So.2d at 850. Nothing in Mr. Stainbrook's voir dire, taken as a whole, shows substantial impairment such that a cause challenge must be granted. When discussing mitigating circumstances and youth of the offender, Mr. Stainbrook conceded that he would consider mitigating circumstances. Viewing Mr. Stainbrook's voir dire as a whole, nothing he stated established grounds for a cause challenge under La. C.Cr.P. art. 797, and no abuse of discretion is apparent in the court's decision to deny the cause challenge.

D. Luther Kincade
Defendant asserts that the trial court erred in denying a cause challenge as to Luther Kincade because he indicated that he already believed defendant was guilty.
A review of Mr. Kincade's voir dire as a whole reveals that he was questioned in panel six. Answering the court's initial questions, Mr. Kincade stated that he had no general opposition to the death penalty, that he could vote to impose the death penalty, that he would follow the law and render a verdict according to the facts, and that he would not automatically vote to impose the death penalty. He also stated that he could not think of any circumstances once the penalty phase was reached where he would not impose the death penalty, but affirmed that he would consider all mitigating circumstances. In response to the trial court's question regarding whether he was going into the case with an open mind, Mr. Kincade replied, "I do have an open mind, but if it's murder, I am biased to agree."
The prosecutor queried Mr. Kincade on his admitted bias:
Ms. O'Bannon: And I think you made a comment you might be biased in a murder case?
Mr. Kincade: Probably, yes.
Ms. O'Bannon: Is that simply because the crime is murder?
Mr. Kincade: Yes.
Ms. O'Bannon: Would you have a predisposed bias before walking in, because he's accused of murder? Or once you found him guilty of murder, that is when the bias would come in, once you seen [sic] evidence, that's when the bias come in?
Mr. Kincade: If someone is accused of murder, I would probably be slightly biased, if they were murdered.
Ms. O'Bannon: You think that this defendant sitting here now is guilty, even though I haven't done anything or shown you anything?
Mr. Kincade: I would probably lean that way  they wouldn't be here if there was not some suspicion.
Ms. O'Bannon: Is suspicion enough?
Mr. Kincade: It is for my bias. I don't know, I guess, maybe circumstantial evidence, if it was not very good circumstantial evidence, something like that. But if someone is accused, been arrested and accused, I guess I am biased.
Ms. O'Bannon: If someone accused you of something you didn't do and you were arrested, what does that say  everybody would believe you did it?
Mr. Kincade: I have no idea.
Ms. O'Bannon: Would that be fair?
Mr. Kincade: I think that's the way it works, generally.
Ms. O'Bannon: Wouldn't you think that most people kind of think he must have done something to be here? Is that going  the fact that you kind of think he must have done something, is that *930 going to keep you from being fair and objective and reviewing the evidence to determine if he did something?
Mr. Kincade: No, I could review the evidence and change my mind.
Ms. O'Bannon: You're starting off that he's guilty.
Mr. Kincade: Well, suspicious, yes. There's a reason and  ... I'm just saying that I would just be biased.... It may be almost like guilty before being proven innocent, that's not the law. The law says you're innocent and you have to be proven guilty. And maybe it's my nature that 
Ms. O'Bannon: He's guilty today sitting before you?
Mr. Kincade: No, I don't know that. I wonder why he's sitting here if there's not a reason.
* * *
Ms. O'Bannon: They have to prove his innocence to you; I don't have to prove his guilt?
Mr. Kincade: No, I want to hear from both sides.
Ms. O'Bannon: Are you going to require the defendant to take the stand 
Mr. Kincade: No.
* * *
Ms. O'Bannon: Do you believe you can be fair and impartial in determining whether or not he's guilty or not?
Mr. Kincade: I would certainly hope and pray that I was fair.
Ms. O'Bannon: Do you think going in you would not be fair right now, whatever the case may be?
Mr. Kincade: I think I would be fair.
Ms. O'Bannon: Have you already formed an opinion about this case?
Mr. Kincade: No.
Ms. O'Bannon: Have you formed an opinion about the defendant?
Mr. Kincade: No.
Ms.O'Bannon: So, until you hear all of the evidence you will wait to form an opinion at that time?
Mr. Kincade: Yes.
Ms. O'Bannon: Will you be able to consider all mitigating evidence before you make a determination on sentence?
Mr. Kincade: Well, I certainly hope so. This is a difficulty I had when you were talking to [prospective juror] Mr. Keasler. If someone is found guilty of murder, and I vote that he's guilty  and I will have to admit, Your Honor, that I'm a little hard of hearing and I was sitting in the back when you read most of those and I'm not really familiar with the [mitigating circumstances] or have them in my memory, but I would try to be fair. I do not want to do anything to an innocent person.
* * *
Ms. O'Bannon: Just because you found him guilty of first degree murder, can you sit and wait and listen to the evidence that's placed before you in the sentencing trial to make a determination about the sentence?

* * *
Mr. Kincade: I would certainly try.... I will follow the law. I do want to be law abiding. And I do not want to break any law, I do not want to break any of His Honor's orders to us.
Ms. O'Bannon: So, if he orders you to be open[-]minded, fair and impartial and not have any opinions before you start this case, would you be able to follow that directive?
Mr. Kincade: I certainly will try.

*931 Ms. O'Bannon: Do you think at this moment you're open-minded about this case?
Mr. Kincade: I think so.
Ms. O'Bannon: And you have not formed any opinions about whether this defendant is guilty or innocent; is that correct?
Mr. Kincade: That's correct.
Ms. O'Bannon: And do you recall  do you require he testify?
Mr. Kincade: No.... I would really want to be fair and square ... about the whole thing. And I don't want to condemn an innocent person.
* * *
Ms. O'Bannon: And once we go to the penalty phase with a guilty man, are you saying that you would automatically vote for the death penalty?
Mr. Kincade: No, I would not automatically vote for the death penalty....
Ms. O'Bannon: And if you  do you see that you could also vote for life, if mitigation warrants it?
* * *
Mr. Kincade: I would consider it.
Ms. O'Bannon: And can you envision yourself ever voting for life, if you thought the circumstances warranted that?
Mr. Kincade: Probably.
Mr. Kincade told defense counsel that many years ago he was a reserve deputy sheriff in Caddo Parish, but stated he didn't think the fact that he was a reserve deputy sheriff would affect his ability to be fair and impartial. Defense counsel probed on the nature of Mr. Kincade's bias, and he reiterated his belief that "I would be suspicious of some reason that he's been arrested. I don't mean to prejudge, but I feel like if he's perfectly innocent, why is he here." Counsel then tried to recast Mr. Kincade's responses to the effect that he would only "give lip service" to considering a sentence of life imprisonment, to which Mr. Kincade retorted:
Mr. Kincade: I disagree with that.... Whenever I read the newspaper, policeman shoots a man, I form in my mind, I pick out who's going to be the hero and who'll be the bad guy. It's the way my mind works, and I would say that 99.9 percent of the people make an opinion when they read an article like that. Maybe I'm wrong.
* * *
Ms. Jones: ... [M]aybe because of your strong feelings about murder, that this wouldn't be the best case for you to sit on. Would you maybe agree with that?
Mr. Kincade: I hope I would not have to, but I probably would have to.
Defense counsel challenged Mr. Kincade for cause because he "had a problem with murder," and, overall, he could not be fair in the case. The prosecutor responded that everyone in society is biased against murder and it is not unreasonable to say such a thing. The district court denied the cause challenge. Ultimately, the twelfth juror was selected before Mr. Kincade's name was presented. Alternate juror selection took place in chambers and off the record, but it appears from the court's jury sheet that defendant used the last of two peremptory challenges given for alternate jury selection to strike Mr. Kincade.
While Mr. Kincade's initial responses suggested an admitted bias against the crime of murder, and a general suspicion toward defendant, the State's voir dire appears to have successfully rehabilitated Mr. Kincade and revealed him to be fair and law-abiding person with an absolute aversion to ever convicting an innocent *932 man. His later responses appear to have overcome his perceived bias, and the trial court's denial of the defense cause challenge appears to be well-founded. Because Mr. Kincade was successfully rehabilitated, we find no abuse of discretion in the trial court's denial of the challenge for cause as to Mr. Kincade.

E. Glenn Harris
Defendant faults the trial court for denying his cause challenge of Glenn Harris on the grounds that he would impose the death penalty in any homicide that was not an accident or in self defense. Defendant further claims that Mr. Harris would not require the State to prove specific intent before he would convict defendant of first degree murder.
Mr. Harris's voir dire responses as a whole reveal that he was called in the second panel. In response to the trial court's general questioning, Mr. Harris stated that he had no general opposition to the death penalty, that he could impose the death penalty, but would not automatically vote to impose the death penalty. Mr. Harris stated he would not impose the death penalty in cases of accident or self defense. He responded that he would consider mitigating circumstances. Pursuant to questioning by the State, Mr. Harris appeared to understand the law of principals, and agreed that he would want to take into account the specific intent of all the actors in the prosecutor's hypothetical. He stated that he understood he had to consider all the mitigating circumstances, that he would walk into the penalty phase with an open mind, and that he would not hold on to a predetermined outcome. He stated that he would not vote for the death penalty automatically, and "would have to have the evidence in front of me before I make that decision."
Pursuant to defense questioning involving a hypothetical in which four juveniles go into a basement, and two rob the building and two flood the basement, Mr. Harris responded as to his understanding of principals:
Mr. Harris: I'm trying to refresh my memory, but I think if they went in as a group and they plan to rob, and they went in as a group, their intent was to rob this facility, then they are all guilty.
* * *
Ms. Alex: And if while they are getting ready to leave, the other two decide to go ahead and unplug the plugs in the building and cause a flood, and the other two have gone, are they all responsible for the flooding damage or  how do you feel about that?
Mr. Harris: Again, as I said, if they went in to do something wrong, they went in as a group.... They had a bad attitude when they went in and they were planning on doing something malicious. And I think they are all guilty.... Now, you said if a group was walking down the street and they didn't have any plans of mischief, one says, there's Joe and he pulled out a gun and shot him, that's a different area. But from the time I was 12 years old, if you pick a group and get in it, whatever they did, you're stuck with it....
Counsel persisted in her inquiry about principals, and asked Mr. Harris if there would be any situation he could envision in which all of the participants would not be guilty, to which he opined:
Mr. Harris: If their group is into doing something of a negative nature, participation like a group, they are in the group and going to doing [sic] something negative, they are all stuck with whatever the dumbest one in there does something. *933 Like a chain, either the strongest link or the weakest link. I'm sorry.
* * *
Ms. Alex: So, you would not require specific intent, you would require general intent, which means that 
Mr. Harris: General involvement.
Ms. Alex: General involvement is enough.
Mr. Harris. In a perpetration of death. I don't know the situation, but they come in there, uninvited, and they got negative things on their mind and they wind up with a perfectly innocent person being violated, this is forever  as long as we can handle ourselves, and that's over.
When counsel asked if he could name a specific mitigating circumstance that may preclude him from imposing the death penalty, Harris responded: "Not right off hand. Maybe a minor, something like that; someone being not of age.... 14, 15. I happen to have a child that age. I can think of that mentality."
During the selection process, defense counsel challenged Mr. Harris for cause, stating that he was "death prone" in that he could not think of any circumstances in which he would not impose the death penalty. She further claimed that he could not grasp the legal principle of specific intent. The court denied the challenge. Thereafter, defense counsel exercised a peremptory challenge to excuse Mr. Harris. Following the State's Batson challenge, counsel reiterated the main points she had argued in challenging Mr. Harris for cause, and the court accepted those reasons as race-neutral.
The trial court did not abuse its discretion in denying the cause challenge as to Mr. Harris. Mr. Harris's responses as a whole expressed fairness. When defense counsel delved into analyzing the specific intent of each of her various hypothetical actors, Mr. Harris appeared to apply common sense and his responses indicate that the group was acting in concert and, thus, equally guilty. State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1224 ("Acting in concert, each man then became responsible not only for his own acts but for the acts of the other."). Thereafter, counsel in effect put words in Mr. Harris's mouth by surmising that he would only require a showing of general intent when principals are involved. Her inquiries and the way in which she presented the concept appear to have gone over the prospective jurors' level of legal understanding. Viewing Mr. Harris's responses as a whole do not suggest that he was pro-death. Nothing presented justified granting a cause challenge under La.C.Cr.P. art. 797, and the trial court properly denied the defense cause challenge.

F. Juror Nina Mears
Defendant avers that prospective juror Nina Mears should have been excused for cause on the grounds that she would automatically vote for death if she was not satisfied that defendant would serve a full life sentence.
During the selection process, defense counsel challenged Ms. Mears for cause based on her responses being "confusing back and forth," and that she may sentence someone to death if she felt that life didn't mean life. The trial court denied the challenge, finding nothing that rose to the level to merit granting a cause challenge. Instead of exercising one of his remaining peremptory challenges, defense counsel accepted Ms. Mears as a juror. Thus, defendant waived his right to assert this claim on appeal. State v. Connolly, 96-1680, p. 10 (La.7/1/97), 700 So.2d 810, *934 818; State v. Bourque, 622 So.2d 198, 229-30 (La.1993).

G. Juror Don Smith
Defendant argues that the trial court erred in denying his cause challenge as to Don Smith because he stated that he could not think of any circumstances in which he would not impose the death penalty if he found someone guilty of first degree murder. Defendant also claims that Mr. Smith refused to follow the law of principals.
A review of Mr. Smith's voir dire responses as a whole reflect that he was questioned in panel four. He disclosed to the judge that he had no general opposition to the death penalty, that he would follow the law as given and render a verdict according to the facts, that as an individual juror he could impose the death penalty, but would not do so automatically. When asked if there were any circumstances in which he would not impose the death penalty, Mr. Smith replied, "I can't answer that without hearing the circumstances, sir." Nevertheless, he assured the judge that he would consider all of the mitigating circumstances before making a decision on death or life. To the prosecutor, Mr. Smith affirmed that he could consider imposing the death penalty, should circumstances warrant it.
In response to defense counsel's hypothetical on principals, Mr. Smith offered that all may not be equally guilty:
Mr. Smith: I agree to a certain extent [that all are guilty], but there are situations where it might be a little different. I don't guess it matters about the age if three or four people are going in unharmed [sic] to trash a building or take the stereos, whatever, and as they leave, maybe one of them is approached by a resident, the owner picks up a 2 × 4, knocks them in the head, kills him, I don't think I could charge the other three with murder. They didn't go in there armed. They thought the one was there, you know, and maybe there are a few situations.
Counsel then sought to revisit Mr. Smith's responses on circumstances that would not merit capital punishment in the following colloquy:
Ms. Jones: Mr. Smith, I talked to you a little bit and you said you wouldn't  when the Judge asked you if there was any circumstance where you would not impose it, you said you didn't know of any.
Mr. Smith: No, that's not what I said.
Ms. Jones: Well, okay.... The judge, he asked everybody, is there any circumstances where you would not impose. Can you think of any circumstances where you would not impose the death penalty?
Mr. Smith: No.
Ms. Jones: I thought you said you didn't know of any.
Mr. Smith: That's correct, I didn't know of any at the time.
Ms. Jones: You have been sitting here for a while. Have you thought about it?
Mr. Smith: Well, a long while.
Counsel, however, never asked Mr. Smith what circumstances he had now thought of. Thereafter, counsel asked about Mr. Smith's interaction with people of other races, and he replied:
Mr. Smith: Yes, ma'am. I have one of my best friends is married to an oriental lady and we visit quite frequently. I work as a supervisor where he works; about half and half, black and white, socialize, we go out to eat together, you know. That's basically it. I work with  I supervise both black and white.
*935 During the selection process, defense counsel challenged Mr. Smith for cause, stating that he "doesn't know of any circumstances and I asked him about this, he said I don't know of any." The prosecutor corrected counsel after she misstated Mr. Smith's views on principals and specific intent. The court found nothing objectionable about Mr. Smith's responses that would merit a cause challenge, and denied the challenge for cause.
Thereafter, the defense used a peremptory challenge to remove Mr. Smith. However, after the State raised a Batson challenge, defense counsel attempted to give race-neutral reasons for the challenge. Counsel stated that he could not state any circumstances under which he would not impose the death penalty, that he was "death prone, and not a good juror for an individual who we're trying to get a life sentence on." Counsel also stated that he would not strenuously apply the "principles specific intent [sic]." The trial court found that counsel was "totally incorrect" on her assessment of Mr. Smith as death prone. Consequently, having found that the defense had not articulated race-neutral reasons for challenging Mr. Smith, the court ordered him seated as a juror on the case.
On the whole, Mr. Smith gave balanced answers that did not establish valid grounds for removal under La.C.Cr.P. art. 797. The trial court did not abuse its discretion when it denied defendant's cause challenge of Mr. Smith.

H. Juror Pamela Nichols
Defendant contends that the trial court erred by denying his cause challenge as to Pamela Nichols because she would not require the State to prove specific intent to convict defendant of first degree murder.
A review of Ms. Nichols's voir dire responses as a whole reveals that she was questioned in the third panel. Ms. Nichols told the trial court she had no general opposition to the death penalty, that she would follow the law and return a verdict according to the facts, that as an individual juror she could impose the death penalty, but would not do so automatically. She could not think of any circumstances in which she would not impose the death penalty, but said she would consider all mitigating circumstances before making a decision as to death or life imprisonment. To the prosecutor, she indicated that if she believed "life meant life" her ability to consider the death penalty would not be impaired. She reiterated that she would consider all mitigating circumstances and accord them the weight she deemed appropriate. She stated a hardship in serving in that she was supposed to serve on an advisory committee to Anheuser Busch starting on Sunday in St. Louis doing financial data support, as owner of the local distributorship. However, she decided that missing the meeting would not weigh so heavily on her mind that she could not concentrate on anything else.
Defense counsel revisited the hardship issue, and Ms. Nichols added:
Ms. Nichols: I think I have a higher integrity than to allow it [missing the meeting] to affect me, but I do believe I would better serve on another jury. This is something that came up after I had gotten the subpoena to come here. And in all fairness, I'm here trying to represent what I should be doing in my citizenship and yet not knowing that this would be something that would take me away tonight or tomorrow, whenever, if I were asked to serve or selected to serve.
Thereafter, counsel gave hypothetical about four principals who entered a building *936 for the purpose of committing a theft, and then two of the actors "decide to hold back and destroy or ruin the building, the basement by flood damage." Given this scenario, Ms. Nichols stated that "if they all intended to go do something malicious, they are all in it together." Counsel next asked Ms. Nichols if she could give a specific instance in which she would not impose the death penalty:
Ms. Nichols: I don't know if I can give you a specific example. Like she said earlier, to come and think of all this  this is all first time for me. I do think that I could impose life, if I thought about the mitigating circumstances. I would certainly have to hear all of that evidence.
Thereafter, counsel read list of mitigating circumstances, and then asked specifically about youth, prompting the following input from Ms. Nichols:
Ms. Nichols: I do not believe in my heart that a chronological age determines the maturity, a decision someone makes in their life. I could not sit here and tell you that just because someone is under the age of 18, they should not be held responsible for actions, nor could I say someone over 18 could also be held for it, if there are situations where they are not mature enough to make those decisions.
When counsel asked Ms. Nichols to explain what was a relevant mitigating circumstance to her, she responded that she could not think of anything. When asked about her interactions with people of other races, Ms. Nichols replied:
Ms. Nichols: Friends, and work and serve on several local boards, fundraising charities with African-Americans, Asian, hispanic. Where I work, 60 percent are minorities.
During the selection process, defense counsel challenged Ms. Nichols for cause on the basis of her stated hardship. Counsel also claimed that Ms. Nichols would not consider the legal principle of specific intent and recalled Ms. Nichols's response that all the actors in the hypothetical were responsible for the whole thing. The trial court found that her responses did not rise to the level of a challenge for cause and denied the challenge.
Subsequently, defense counsel attempted to excuse Ms. Nichols peremptorily, and the State raised a Batson challenge. Counsel gave the same reason she had articulated in the challenge for cause, namely that the juror would not "follow specific intent." The court disagreed with counsel's assessment stating that it had taken notes "[a]nd this is a direct quote, if they ... intended to do something malicious, they are responsible. I see nothing incorrect about that statement." The court did not accept counsel's reasons as race-neutral and ordered that Ms. Nichols sit as a juror.
On the whole, the responses of Ms. Nichols were balanced and fair. She voiced no bias, and, contrary to counsel's contentions, she appeared to grasp the concept of principals and specific intent. No basis for granting a cause challenge under La. C.Cr.P. art. 797 is apparent in her responses, and the trial court did not abuse its discretion in denying the challenge as to Ms. Nichols.

I. Jurors Butler, Smith and Nichols
Defendant argues that the trial court erroneously compelled him to accept jurors he attempted to strike peremptorily. Specifically, he claims that the State did not sustain its burden of proof in the Batson challenge and Jurors Butler, Smith and Nichols should not have been seated in this case.
*937 As will be detailed below in greater detail, the Supreme Court held in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that an equal protection violation occurs when a party exercises a peremptory challenge to exclude a prospective juror on the basis of race. If the challenger makes a prima facie showing of discriminatory strikes, the burden shifts to the opposing party to offer racially-neutral explanations for the challenged juror. If a race-neutral reason is given, the trial court must then decide whether the challenger has proven purposeful discrimination. Whether there has been intentional racial discrimination is a question of fact. State v. Tyler, 97-0338, p. 4 (La.9/9/98), 723 So.2d 939, 943. The decisive question in the analysis is whether the race-neutral reason should be believed. Id. at p. 12, 723 So.2d at 946-47. A reviewing court owes the trial court's evaluations of discriminatory intent great deference and should not reverse unless the evaluations are clearly erroneous. Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991); Dunn, 01-1635 at p. 8, 831 So.2d at 869.
In Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court held that a white criminal defendant may not use peremptory challenges in a racially discriminatory manner to exclude black jurors from his jury. In State v. Knox, 609 So.2d 803 (La.1992), this court interpreted McCollum to prohibit black criminal defendants from exercising their peremptory challenges to exclude white jurors.
In Tyler, this court held that the record supported the trial court's determination that racial discrimination motivated defendant's use of certain peremptory challenges and that the race-neutral reason offered by defendant could be viewed as a pretext for discrimination. Similarly, in Dunn, we determined that the trial court was not clearly erroneous in refusing to allow defendant to exercise a peremptory challenge when the challenge was the result of discrimination. We stated:
This court will very carefully evaluate the trial court's abrogating a defendant's use of a peremptory challenge especially in a death penalty case, where the stakes are so significant. However, the law is quite clear that discriminatory use of peremptory challenges, whether by the defendant or the State, cannot be tolerated.
Dunn, 01-1635 at p. 11, 831 So.2d at 872.
In the instant case, defendant exercised three peremptory challenges against white jurors in the first panel. In the second panel, defendant had exercised three more peremptory challenges against white jurors when the State raised a Batson challenge against defendant. Once the Batson challenge was raised, defense counsel immediately offered race-neutral reasons for her use of the peremptory challenge against the first juror challenged peremptorily, Mr. Yates. The trial court found defendant offered race-neutral reasons for his challenge of Mr. Yates.
The second juror challenged peremptorily was Mr. Butler. As discussed above, defense counsel offered various reasons for her challenge of Mr. Butler, including that he was "a white male ... who lives in [a] predominantly white area." The State immediately responded that the reasons given were not race neutral. The trial court agreed. We find it is clear in this instance that the trial court did not err in determining that defense counsel engaged in discrimination when she exercised a peremptory challenge against Mr. Butler. Consequently, it was proper for the discrimination to be remedied by ordering Mr. Butler be made a member of *938 the jury. See Dunn, 01-1635 at p. 12, 831 So.2d at 872.
Regarding Mr. Smith, defense counsel defended her use of the peremptory challenge by stating he was death prone and would not strenuously apply the law of principals and specific intent. The State responded that "[h]e never said anything she's alleging he said." The trial court found that defense counsel was "totally incorrect" in characterizing Mr. Smith as death prone. The trial court also noted that Mr. Smith affirmed he would follow the law as given. After careful consideration, we conclude the trial court was not clearly erroneous in its finding that these reasons were not race-neutral. Based on our review of Mr. Smith's voir dire responses, we find the stated reasons could be viewed as a pretext for discrimination. Consequently, it was not error for him to be seated on the jury.
When a Batson challenge was raised as the defendant's use of a peremptory challenge against juror Nichols, defense counsel stated she was stricken because her answer to the hypothetical indicated she would not "follow specific intent." The State responded that defense counsel was again misstating what a potential juror had said. The State indicated that Ms. Nichols answered the hypothetical according to the law. The trial court agreed with the State that Ms. Nichols said nothing incorrect in her answer to the hypothetical. After careful consideration, we must again conclude that the trial court could reasonably have viewed defense counsel's explanation as a pretext for discrimination. Consequently, we find it did not err in its determination that defendant engaged in discrimination when he exercised a peremptory challenge against Ms. Nichols and in seating her on the jury.
We similarly find no merit in defendant's contention that the trial court erred because there was no evidence of a prima facie case of discrimination and that the trial court did not apply the proper burden. While it is true that the trial court did not expressly rule on the issue of the State's prima facie case of discrimination, defense counsel immediately attempted to offer race-neutral explanations for her use of peremptory challenges and did not object that the State failed to provide a prima facie case of discrimination. Once the explanations were offered and the trial court ruled on the ultimate issue, the preliminary issue of whether a prima facie showing was made is moot. See Dunn, 01-1635 at p. 12, 831 So.2d at 873. Additionally, we find no error in the way the trial court handled the State's Batson challenges.

Assignments of Error 19-24
In these assignments of error, defendant claims that the trial court improperly removed jurors who would consider the death penalty and agreed to follow the law. Defendant argues that, at most, the jurors that the State challenged for cause merely indicated an inclination for life, rather than a substantial impairment.
A prospective juror is properly excluded for cause because of his or her views on capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of exclusion under La.C.Cr.P. art. 798(2)(b), which incorporates the standard of Witherspoon v. Illinois, *939 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror's views "would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." Witherspoon further dictates that a capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury prohibit the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id., 88 S.Ct. at 1777. Moreover, notwithstanding La.C.Cr.P. art. 800(B), which states that a defendant cannot complain of an erroneous grant of a challenge to the state "unless the effect of such a ruling is the exercise by the state of more peremptory challenges than it is entitled to by law," the United States Supreme Court has consistently held that it is reversible error, not subject to harmless-error analysis, when a trial court erroneously excludes a potential juror who is Witherspoon-eligible, despite the fact that the state could have used a peremptory challenge to strike the potential juror. Gray v. Mississippi, 481 U.S. 648, 664, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622 (1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).
To determine the correctness of rulings on voir dire, a review of voir dire as a whole must be undertaken. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108 (trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror); State v. Williams, 457 So.2d 610, 613 (La. 1984); State v. Hall, 616 So.2d 664, 669 (La.1993).
In the instant case, the State used only seven of its allotted peremptory challenges during jury selection. However, as set out above, the State's failure to exhaust its peremptory challenges does not preclude review of the trial court's rulings on individual Witherspoon challenges.

A. Joyce Silas
Defendant contends that the trial court erred in granting the State's cause challenge as to Joyce Silas because of her "vacillation" between stating that she was not opposed to the death penalty, and stating that she did not want to be the one to sentence someone to die.
A review of Ms. Silas's voir dire responses as a whole reveals that she was called in the second panel. In response to the trial court's questioning, she stated she had no general opposition to the death penalty, she would follow the law as given and return a verdict according to the facts, as an individual juror she could impose the death penalty, but would not do so automatically. She stated there were no circumstances in which she would not impose the death penalty. She affirmed that she would consider all mitigating circumstances before making a decision on death or life imprisonment. Pursuant to the State's questioning, when asked whether a belief that "life meant life" would impair her ability to vote for the death penalty, Ms. Silas responded that it would not. When asked to come up with cases in which she thought the death penalty was appropriate, she stated that she could not. However, she indicated that Ted Bundy deserved the death penalty. However, when the prosecutor asked Ms. Silas if she could see herself sitting in a room saying "he deserves to die," she indicated that she could not. The prosecutor asked her if she considered herself a person who believes that the death penalty is appropriate in certain circumstances, but she just does not want to be a part of it, and Ms. Silas stated that she considered herself such a *940 person. Ms. Silas additionally indicated that because she was self-employed, serving on the jury would pose a financial hardship for her.
In response to defense counsel, Ms. Silas indicated that she would not be bothered by sympathy if the victims' families cried during the trial. She stated that she would not refuse to impose the death penalty, even if she felt that "life meant life." Ms. Silas also stated that she could impose the death penalty.
During the selection process, the State challenged Ms. Silas for cause. The challenge was based on Ms. Silas's feeling that although she believes in the death penalty, she could not envision herself imposing it, and her stated financial hardship. The court found that in her total responses, Ms. Silas "vacillated back and forth insofar as her opinion on the death penalty" was concerned and her attitude would substantially impair her performance of her duties in accordance with the law. Therefore, the trial court granted the State's cause challenge.
La.C.Cr.P. art. 798(2)(c) authorizes the State to challenge for cause if the prospective juror's "attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt." Viewing Ms. Silas's voir dire as a whole, we note that she voiced no opposition to the death penalty in the abstract, but she stated did not want to be personally involved in the decision of whether to impose it. The trial court also noted that Ms. Silas's attitude would prevent her from performing her duties. We find the trial court did not abuse its discretion in granting the challenge for cause as to Ms. Silas. No relief is due in this instance.

B. Clara Dugas
Defendant argues the trial court granted the State's cause challenge as to Clara Dugas because of an erroneous belief that Ms. Dugas could not impose the death penalty if "life means life."
A review of her voir dire as a whole reveals that she was questioned in the second panel. During the trial court's initial inquiries, Ms. Dugas told the judge that she was not opposed to the death penalty if the person "killed somebody in cold blood." When the judge repeated the question of whether she had any opposition to the death penalty, Ms. Dugas stated that "I wouldn't want anyone to have it, if I had to." She was equivocal when asked if she as an individual juror could impose death, stating, "I guess I could; with a jury I would have to, if it comes to that agreement." She would not vote to impose death automatically. She offered accidental killing or not being aware of what you're really doing at the time as a case in which she deemed the death penalty inappropriate. She stated she would consider all mitigating circumstances. The prosecutor asked Ms. Dugas to clarify her views on capital punishment:
Ms. Dugas: Like I said, if you know, you kill somebody cold blooded. Now, I don't want to really have to vote for it, like the man cut her up and put her in the freezer. That's some things you have to think about. Sometimes you have to get your 
Ms. O'Bannon: Can you see yourself actually imposing the death penalty, writing the word death on a piece of paper and turning it into a foreman and sitting, looking him in the eyes?
Ms. Dugas: It was really bad.
Ms. O'Bannon: Give me an idea.
Ms. Dugas: Like I said, a man killed a lady and he put her in the freezer.
* * *
Ms. Dugas: Maybe something was wrong with him. He could have had life *941 imprisonment, either way. He could get life imprisonment. I didn't have to just give him the death penalty.
* * *
Ms. O'Bannon: Although you believe in the death penalty, you think it's more appropriate for them to spend the rest of life in jail?
Ms. Dugas: Yes, I guess.
When defense counsel posed the hypothetical about principals, Ms. Dugas stated the following:
Ms. Dugas: Like I said, if one do more than the other one, can't punish the one that didn't do bad; same as the one that did it.
During the selection session, the prosecutor raised a cause challenge as to Ms. Dugas because of her preference for life imprisonment. The court found Ms. Dugas "very hesitant in answering the questions as to the death penalty," and granted the State's cause challenge. We find no abuse of discretion in the trial court's granting the cause challenge as to Ms. Dugas. See State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108 (A trial judge is accorded broad discretion in ruling on cause challenges because he or she "has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties' attorneys."). The totality of Ms. Dugas's responses indicated she had a general preference for life imprisonment. We conclude the record supports the State's concerns about her ability to vote for the death penalty. La.C.Cr.P. art. 797(2). The trial court properly excused her for cause.

C. Jacqueline Miller
Defendant complains that the trial court excused Jacqueline Miller for cause based on her "flip flop" on the death penalty.
A review of Ms. Miller's voir dire responses reveals that she was called in the fifth panel. In response to the trial court's initial questions, Ms. Miller stated she had a general opposition to the death penalty in most cases based on her religion. She assured the judge she would follow the law, and return a verdict according to the facts. As an individual juror, she could impose the death penalty if she felt it was warranted, but would not do so automatically. Situations in which she would not impose the death penalty included: "If I felt the person had some regrets, the person's upbringing, mainly the things you stated." Recognizing Ms. Miller had given somewhat inconsistent responses on capital punishment, the judge asked her to clarify her position and she stated: "If I felt that the person would be capable of killing again. I feel like that could endanger someone else's life, and I would feel guilty being a part of that even if in prison. I feel that that's wrong, to kill someone." To the prosecutor, Ms. Miller reiterated her opposition to the death penalty. However, she stated that she could look someone in the eye and say you must die for what you did. She further indicated that knowing that "life meant life" would not impair her ability to vote for the death penalty. The prosecutor asked Ms. Miller to reconcile her two positions on the death penalty, and she acknowledged that she "was" opposed to the death penalty on her questionnaire, but she stated:
Ms. Miller: I would feel to some extent responsible if I felt that person showed no sympathy or remorse for the crime.... Just looking at his past behavior, from what the witnesses have recorded in the past.

*942 Ms. O'Bannon: How would that show remorse for the present crime?
Ms. Miller: Well, if that person has done things that maybe were due to his environment, and there was some sign that he could make better choices from things that come up in the past.
Ms. O'Bannon: So you would look at it in terms of that evidence, would be to determine remorse whether he should live or die? That's the bottom line, is whether he has remorse as to whether he lives or dies?
Ms. Miller: I'm sure it would be more than that. It's kind of a thought provoking point for me right now, but I'm of the Christian faith and I do believe that we make mistakes and I do believe that some people can be redeemed.
Under defense questioning, Ms. Miller indicated that she would not hold it against defendant if he did not testify. Ms. Miller stated that, after considering all the mitigating circumstances, she could vote to impose a sentence of death. Regarding a hypothetical on principals, Ms. Miller indicated that "I think there are two different measures going on. I think they should be separate." Ms. Miller stated that she sees a bad childhood as a factor to be considered in mitigation.
During the selection process, the State issued a cause challenge for Ms. Miller based on her requirement that the State prove that the defendant is not remorseful before she would return the death penalty. In addition, the State noted that Ms. Miller's answers to the hypothetical seemed to require that the State prove that defendant is the triggerman before she would vote for the death penalty. The trial judge stated he was baffled by Ms. Miller. He noted that she specifically indicated a general opposition to the death penalty, but then when counsel questioned her, she did a "complete flip flop." The court found her attitude would prevent her from performing her duty in accordance with law and granted the State's cause challenge.
Ms. Miller's answers to voir dire questions were inconsistent. The record supports the trial court's finding that Ms. Miller's views would substantially impair her from her duties as a juror. La.C.Cr.P. art. 797(2). The court's ruling to grant the State's cause challenge was not erroneous.

D. Cassandra Piper
Defendant avers that the trial court erred by granting the State's cause challenge as to Cassandra Piper based on her responses that she would not impose the death penalty except in the case of a serial killer or an extremely violent murder.
A review of Ms. Piper's voir dire responses as a whole reveals that she was called in the first panel. In response to the trial court's initial questioning, Ms. Piper stated, "I have to answer that and say yes, I do have a general opposition [to the death penalty]. I would like to feel that I'm totally opposed to it, but I cannot get totally to that. I have to be very candid, there's been cases where the death penalty had been handed down and I was pleased." She stated she could follow the law and render a verdict according to the facts, and that perhaps she could impose the death penalty as an individual juror, but she hoped she would never be put to the test. She stated she would absolutely not automatically vote to impose the death penalty. In response to the State's inquiries, Ms. Piper indicated that she could abide by the law with respect to sanity. When asked whether "life meant life" would impair her ability to consider the death penalty, Ms. Piper replied:

*943 Ms. Piper: I would have to answer again and just honestly say to you, I do not know. Because I can think of two instances where people received the death penalty and it pleased me.... Well, first was Ted Bundy in Florida. It's not anything I'm proud of, because prior to that I felt I was opposed to the death penalty. I like to think now I'm reasonably opposed.... The other case was a young lady that my heart went out to in Texas, Huntsville, I believe it was. She had been involved in some very heinous crimes as a young woman, but she was very repentant, or she said she was. She appeared to be, but at the same time it bothered me that when they did not spare her the death sentence-and I'm being totally candid. I prefer not to do this; however, I'm doing it because it's required right now. I was not distressed by that. So the best that I can tell you today is that I don't know what my position would be if I was faced with it after hearing the facts of the case. I'd still like to believe that I'm generally opposed to the death penalty, for many reasons. I would still like to believe that.
In response to defense questioning involving a hypothetical principal situation, Ms. Piper indicated that if people entered the building to steal, but one person took it upon himself to do something different, then that person would be individually responsible for that crime. Ms. Piper also agreed that a person's childhood has some impact "on how he or she turns out." She also stated, "I believe in the power of overcoming. I believe in the power of transformation.... [P]eople can change." Ms. Piper felt that people can overcome a bad childhood. Ms. Piper would also consider youth as a mitigator.
During the selection process, the State challenged Ms. Piper, citing her general opposition to the death penalty and her ability to state only two extreme examples of cases in which she thought the death penalty was appropriate. The court agreed that the juror was opposed to the death penalty, and noted that "in answering the questions so far as the death penalty is concerned ... this particular juror... showed hesitation in her answers." The court granted the challenge for cause as to Ms. Piper.
The totality of Ms. Piper's responses underscored a life-long opposition to capital punishment. Although two infamous cases in which the death penalty was imposed did not upset her, that change in her belief system surprised her, and seemed to be a change she sought to suppress. The record reveals there was no abuse of discretion in the trial court's decision to grant the cause challenge as to Ms. Piper. La. C.Cr.P. art. 797(2). No relief is due in this instance.

E. Daron Martin
Defendant argues that the trial court erroneously excused Daron Martin based on the State's view that he could not serve because he was physically disabled.
As an initial matter, counsel failed to object after the court granted the State's challenge for cause as to Mr. Martin. Thus, the issue was not properly preserved for appellate review. La.C.Cr.P. art. 841; State v. Taylor, 93-2301 (La.2/28/96), 669 So.2d 364 (scope of review in capital cases is limited to alleged errors that are contemporaneously objected to).

Assignments of Error 25-29
In these assignments of error, defendant avers that the trial court allowed the State to use racially-motivated peremptory challenges by using a lower standard in assessing the race neutrality of the six (out of seven) challenges used against African-Americans. *944 Defendant claims that the State used more than 85% of its peremptory strikes to remove black jurors.[11] Specifically, defendant points to four peremptory challenges exercised by the State against African-American jurors: Kathy Brooks, Glenda Coley, Larry Living and Jacqueline Smith.
As briefly discussed above, the Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. See also La.C.Cr.P. art. 795. If the defendant makes a prima facie showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989). If the race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the defendant has proven purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991); Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.
The Batson explanation does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. Purkett, 115 S.Ct. at 1771. The Hernandez court explained:
A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the [party's] explanation, the reason offered will be deemed race neutral.
Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866. The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination. Purkett, 514 U.S. at 767-68, 115 S.Ct. at 1771; Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866.
Ultimately, the jury seated in the instant case was composed as follows: 11 white jurors, and one black juror. The alternate jurors were both white. While the presence of one minority juror on the panel does not alone defeat a Batson challenge, particularly in a case in which their votes could not prevent the remaining jurors from returning a verdict on strict racial lines, see Collier, 553 So.2d at 819-20, it remains a relevant circumstance of the court to consider in assessing the prosecutor's overall intent. State v. Duncan, 99-2615, p. 27 (La.10/16/01), 802 So.2d 533, 552. In the present case, a review of the voir dire record as a whole indicates that the State articulated race-neutral reasons for each of the four challenges about which defendant now complains. No pattern of racial strikes by the State is detected, nor is any abuse of discretion by the trial court in its finding that the defense failed to present a prima facie case of purposeful discrimination.

*945 A. Kathy Brooks

Defendant avers that the State's explanation for striking Kathy Brooks was pretextual.
A review of Brooks's voir dire responses as a whole reveals that she was questioned in the second panel. She told the trial court that she does not have a general opposition to the death penalty, that she would follow the law and render a verdict according to the facts, that as an individual juror she "thinks" she can vote for the death penalty, but she would not do so automatically. Ms. Brooks stated that in cases of self-defense, she would not think the death penalty appropriate, and affirmed that she would consider all of the mitigating circumstances before reaching a decision on death or life imprisonment. In response to the State's questioning, Ms. Brooks revealed that her 22-year-old son was arrested on a drug-related offense about a year and a half ago. The following discussion ensued:
Ms. O'Bannon: And what was your opinion of the system, the criminal justice system?
Ms. Brooks: He did it, because all the evidence was there. It was in his apartment, you know. I love him to death, but the drugs was there. The guns was there, so 
Ms. O'Bannon: If your son, what if your son was sitting in this place, here today. You had been in the system watching your son as a defendant. And let's say that crime carried the death penalty and the jury came back with the death penalty, how would you deal with that....?
Ms. Brooks: That would be hard, because you see it a totally differently [sic] way because it's your child. And I can't answer that. I truly believe if you do what you did, you deserve, you know 
Ms. Brooks felt that if the crime was heinous, and the victim was her own mother, the death penalty may be appropriate. However, when the prosecutor asked, what if her own son was the perpetrator, Brooks replied, "It would be hard, but I would have to think about it."
Upon defense questioning, Ms. Brooks considered counsel's hypothetical on principals, and responded that as to the four perpetrators, "I don't think the other two should be responsible with what the other person did." Once Ms. Brooks was apprised that a case of self-defense would not be eligible for capital punishment, she could not think of any other situations in which the death penalty would not be appropriate, unless the offender's "medical history" could be proven. Ms. Brooks also responded that she could consider youth as a mitigator because "I have teenagers and I know their minds and I know what they will do. They know right from wrong." Counsel clarified that Ms. Brooks meant youth as a reason not to give the death penalty, to which Ms. Brooks affirmed, "I would consider it." She agreed that if her son were facing the death penalty, she would testify on his behalf at the penalty phase, consequently, she would listen and give credence to defendant's mother.
During the selection process, both sides provisionally accepted Ms. Brooks as a juror. Subsequently, the State exercised a peremptory backstrike as to Ms. Brooks, prompting defense counsel to raise a Batson challenge. The State objected, stating that the defense had not demonstrated a prima facie case as to discriminatory intent, and the court agreed with the State, in light of the fact that the state had only exercised one peremptory challenge before that point.[12] Because the court found defendant *946 had not made a prima facie case of discrimination, it did not require the state to articulate race-neutral reasons. However, following the State's third peremptory strike as to a black juror, the court ordered the State to go back and provide race-neutral reasons for all three strikes, including Ms. Brooks. The prosecutor offered the following reasons as to her challenge of Ms. Brooks:
Ms. O'Bannon: Initially I accepted her in spite of reservation for her son's involvement in the criminal justice system. It was not until actually that Ms. Jones mentioned yesterday when she was defending her Batsons, that the potential juror has a son the same age as the defendant and she wanted her because she would feel sympathy because she had a son that's 18; and once she made that statement I became concerned that Ms. Brooks would show entirely too much sympathy and I believe that would be difficult for her to consider imposition of the death penalty on someone that's the same age as her son. And other [sic] thing that concerned me, after she was selected she put her head down and started laughing. I got a bad feeling from that as well.
The court found that the State's proffered race-neutral reasons for challenging Ms. Brooks were, in fact, race neutral and therefore allowed the State to peremptorily challenge Ms. Brooks. Id.
This court has previously considered the fact that a family member is a convicted criminal a racially-neutral reason for excluding a prospective juror. See State v. Tilley, 99-0569, p. 4 (La.7/6/00), 767 So.2d 6, 18 (one venirewoman had two sons with felony convictions); State v. Lindsey, 543 So.2d 886 (La.1989). Federal courts have also approved as race-neutral challenges of prospective jurors whose family members have been in trouble with the law. See United States v. Yankton, 986 F.2d 1225, 1231 (8th Cir.1993) (venireman's brother had criminal record). Under these circumstances, the State's peremptory strike of Ms. Brooks withstands Batson scrutiny.
Appellate counsel argues that if having a child who had experience in the criminal justice system was indeed an important criterion for the State, the prosecutor neglected to query juror Butler, a white male, about his daughter's criminal arrest, which was disclosed on Mr. Butler's jury questionnaire. Counsel claims that the fact that the State did not ask Mr. Butler about his daughter demonstrates the disparate treatment toward white and black jurors practiced by the prosecution in this case. In State v. Collier, 553 So.2d 815, 822 (La.1989), this court rejected a proffered explanation when the prosecution failed to exclude other prospective jurors not of defendant's race, who shared the same characteristic as that claimed as the reason for the challenge. However, in this case, Mr. Butler's daughter presented a far different scenario than Ms. Brooks's son. Mr. Butler's child was middle-aged female, whereas Ms. Brooks's son was roughly the same age as defendant. The State's tacit acceptance of Mr. Butler's daughter's situation did not in itself implicate Collier because the differences in age and gender between the prospective jurors' children reflected that the issue could have turned on factors other than race. No relief is due in this instance.

B. Glenda Coley
Defendant urges that the State struck Glenda Coley peremptorily based on race, and that its stated reasons were pretextual.
*947 A review of Ms. Coley's voir dire responses as a whole reveals that she was questioned in the fifth panel. Ms. Coley's pre-qualification with the judge began with the following exchange:
The Court: Ms. Coley, do you have a general opposition to the death penalty?
Ms. Coley: No.
The Court: Can you as an individual juror vote to impose the death penalty?
Ms. Coley: No.
The Court: You don't have a general opposition to the death penalty, but you're saying that if you are on the jury, if you were selected in this case, that you could not vote to impose the death penalty if the circumstances warranted it?
Ms. Coley: Probably so.
The Court: What's your answer? You can vote to impose the death penalty? If you can't, say that. You heard us  The attorneys mentioned it this morning, and I've stated it. There's no right or wrong answers, it's what you actually believe. So, if you were selected as a juror in this case, and if you reached the penalty phase of the trial, could you as an individual juror vote to impose the death penalty?
Ms. Coley: Yes.
Thereafter, Ms. Coley stated that she would not vote death automatically. Instances in which she would not vote for death included "mental, drugs, something like that." She stated she would consider all mitigation before reaching a decision on death or life imprisonment. Id.
The prosecutor asked her about her opposition to the death penalty, which she acknowledged, but added: "It would be hard." The prosecutor asked if she could look someone in the eye and say you must die for what you did, to which Ms. Coley replied: "I don't know. It would be hard if I have to do it, to get to the point after everything boiled down. It will be hard." She reiterated that if there was evidence the offender had a drug problem or a mental illness, she would not vote for the death penalty. Ms. Coley stated she could not imagine herself imposing the death penalty and would not vote for it.
Under defense questioning, the following discussion took place:
Ms. Jones: Ms. Coley, it seems to me, was you final answer was that you could impose the death penalty; was it not?
Ms. Coley: Yes.
* * *
Ms. Jones: If you go through, you still  you won't say he has a mental defect and I'm imposing life?
Ms. Coley: Yes.
Ms. Jones: What you will do, if I understand you is, the prosecutor has her burden, you find she carries her burden  can't make it, it's life. If you find she hasn't carried the burden, it's life. You listen to all the mitigating and you weigh them in your mind and consider them, you can still come back and impose a sentence of death if you found that that was the appropriate sentence, correct?
Ms. Coley: Yes.
Ms. Coley further reflected with respect to mitigation: "Sometimes when you have a bad childhood, it will scar you for life, depending on how bad it is."
During the selection session, the State issued a cause challenge for Ms. Coley, which the court denied. Thereafter, the State struck Ms. Coley peremptorily, citing as reasons the same she had just articulated for cause, namely that "she could not consider the death penalty in cases where the defendant was on drugs or mentally defective in some way and that would *948 substantially impair her." Counsel objected that the prosecutor did not challenge a white juror, Ms. Maca, who was "even stronger than Ms. Coley." In response, the prosecutor argued as follows:
Ms. O'Bannon: If I may respond to that. Ms. Maca, I would have to defend that  she could impose the death penalty. She said that beginning to end. Ms. Coley upon initial questioning of the Court said she could not vote for the death penalty, and on her form also made statements that supported that statement she made to the Court. She said, I cannot vote for the death penalty. Ms. Maca never said that. My reason I don't want her is because she stated she could not vote for it and in certain situations, it would substantially impair or prevent her from considering imposition of the death penalty.
The court accepted the State's reasons as race-neutral, taking into consideration the totality of Ms. Coley's responses, including her demeanor in answering.
Ms. Coley's pre-qualification voir dire with the trial judge was anything but definitive. She expressed indecision about capital punishment, as recorded on her jury questionnaire, which is a legitimate race-neutral concern. State v. Williams, 96-1023, pp. 32-33 (La.1/21/98), 708 So.2d 703, 727 (State's assertion that juror appeared "weak, scary and shaky on the death penalty" accepted as race-neutral reason). The State's peremptory challenge appears well-founded upon race-neutral reasons. No Batson violation is apparent and the trial court did not abuse its discretion in so finding.

C. Larry Living
Defendant claims that Larry Living was struck because he is a black man, rather than the state's purported reason that he would require the state to prove premeditation.
A review of Mr. Living's voir dire responses as a whole reveals that he was called in the fifth panel. Mr. Living's voir dire with the trial judge indicated that he had no general opposition to the death penalty, and that as an individual juror, he could impose the death penalty, but would not do so automatically. He stated that he would follow the law and render a verdict according to the facts, that mental incompetence or under the influence of drugs would be circumstances that he would not vote to impose the death penalty, and that he would consider all mitigation before deciding death or life imprisonment. Under questioning by the State, Mr. Living appeared confused on the concept of specific intent:
Mr. Living: Well, I agree with what he said, go in there to rob someone, and all of a sudden you make a decision that maybe you want to harm them enough to get away, kill them, I don't know. They could make that decision in a split second. You would have to show me that's what they intended to do.
Ms. O'Bannon: I would have to show you premeditation, that's what you're saying? You want to see premeditation?
Mr. Living: Yes.
Mr. Living reiterated that he could envision himself actually imposing the death penalty "if the evidence was a fact that he did it, you know.... I would have to hear the evidence, both sides. I would have to go by what the evidence, whatever the attorney presented evidence. Might be against them, might not." Mr. Living continued that he would not require defendant show remorse, and that if "life meant life" that fact would not impair his ability to vote for the death penalty." Mr. Living reiterated that if the offender was mentally incompetent or mentally impaired, he *949 "definitely" would not vote for the death penalty.
Responding to defense counsel, Mr. Living assured that he had no problem with defendant not testifying. Counsel then tried to rehabilitate Mr. Living on his earlier views on premeditation:
Ms. Alex: Will you hold the prosecution to their burden of proving specific intent?
Mr. Living: Yes.
Ms. Alex: The prosecutor talked earlier to you about premeditation. The Judge will instruct you on the law. He's going to tell you what the law is. If the Judge tells you that the prosecutor only has to prove specific intent, will you abide by what the Judge tells you?
Mr. Living: Yes.
Ms. Alex: You will not make the prosecutor prove premeditation?
Mr. Living: I don't think so. No.
Ms. Alex: You hesitated a little bit, so I will ask you a little more.... Can you put aside that issue of premeditation and just follow the law?
Mr. Living: Yes, I think I could.
Mr. Living interpreted counsel's hypothetical regarding principals as follows:
Mr. Living: I feel four of them were going in for the same to do the same thing, steal the candy. And other two decided that they were  they would be guilty of flooding and stealing the candy.... They had an intent, but they had a change of heart, evidently when they got in there. I know of a case years ago where there was two men escaped from the prison. And they killed a couple in Minden, supposedly both of them did. One of them actually did the killing. The other one was there, but both of them received the death penalty and both died for it, which one said he wasn't the trigger man.
Ms. Alex: How did you feel about that?
Mr. Living: Well, I thought the one that actually didn't do the killing should have maybe gotten life in prison or something.
During the selection session, the State challenged Mr. Living for cause on the grounds that he would require the State to prove premeditation. Defense counsel objected claiming that Ms. Alex had rehabilitated him. The court agreed with the defense, and denied the State's cause challenge. Thereafter, the State excused Mr. Living by peremptory strike, offering: "Challenge on the reasons I gave for cause. Those are the Batson reasons.... I will add one other. He has a 19-year-old. That would be the same age as the defendant." The court found the State's reasons race-neutral.
The totality of Mr. Living's voir dire responses supports the trial court's decision. There is no demonstration that the court abused its discretion in allowing the peremptory strike as to Mr. Living.

D. Jacqueline Smith
Defendant avers that the State struck Jacqueline Smith based on race, and that its stated reason that because she had worked with mentally retarded persons, she would be unable to vote for death if the offender had a mental illness, was pretextual.
A review of Ms. Smith's voir dire responses as a whole reveals that she was questioned in the fourth panel. In Ms. Smith's pre-qualification inquiries, she told the judge that she is generally opposed to the death penalty. She would impose the death penalty in circumstances of mass murder. When asked if that was the only circumstance, Ms. Smith elaborated:
Ms. Smith: I probably have mixed feelings about it. I really, I prefer listening *950 to all the circumstances and things like that. Basically, I haven't  I've never been exposed to a case, or having served on a jury, I would say I oppose it, just from a general aspect. I don't like death. I don't like to impose death on anyone.
The prosecutor asked Ms. Smith about capital punishment:
Ms. O'Bannon: Ms. Smith, I believe you're pretty definite that you were opposed to the death penalty and could not impose it; is that correct?
Ms. Smith: Yes. Not absolutely though, but I would not impose it.
In response to defense counsel's inquiry about whether abusive childhood as a mitigating circumstance would play a role, Ms. Smith expounded as follows:
Ms. Smith: I do. I believe so. I believe what you have been exposed to in your life will filter out and I believe if you have not been exposed to positive or spiritual, if you have not been exposed to a certain amount of things that, you know, like say the kids in high school now, they have not begun that parenting stage or they haven't gone beyond the 18 years old to be considered as an adult. If they had been exposed to this kind of stuff and that's all they know, you should teach your kids right. If they've never been exposed to that, then whatever they have been exposed to will filter out and maybe some time, that second, that's what filters out.
Defense counsel sought to rehabilitate Ms. Smith:
Ms. Jones: Ms. Smith, I understood and I kind of felt like you were like Ms. Antwine that your final decision was you could impose [the death penalty].
Ms. Smith: I could. It would have to be  it would have to be 
Ms. Jones: It would have to be, like Ms. Mears, you feel like it would be serious.... If you listen to all the evidence and you said this is a death penalty case, you could impose it, correct?
Ms. Smith: Yes.
Thereafter, Ms. Smith attempted to clarify her views on bad childhood:
Ms. Smith: I really depends, bad can be bad and worse can be worse. You don't know what kind. I want you to be more specific. I had a bad childhood and did the same. I tried to better myself; but then there's bad, bad and worse. And I had been exposed to some of it. Not personally, but, you know, it depends. Just because a person has a bad childhood doesn't mean that he should get off or she should get off. It's something to consider and I would.
Ms. Smith also affirmed that youth would be an important factor for her to consider in mitigation.
During the selection process, the state issued a challenge for cause as to Ms. Smith based on her opposition to the death penalty. Although the judge found Ms. Smith "really a baffling juror," he nevertheless denied the State's cause challenge. Thereafter the State struck Ms. Smith peremptorily, and reiterated the same justification that it had previously announced in its cause challenge, namely that Ms. Smith's true feeling is that she could not actually consider imposing the death penalty. The court credited the State's reasons as being race-neutral.
Viewing Ms. Smith's voir dire responses as a whole, it appears she was generally opposed to capital punishment. The prosecutor was within permissible bounds to strike a potential juror who cannot consider imposing the death penalty. See State v. Williams, 96-1023, pp. 32-33, 708 So.2d 703, 727 (State's assertion that juror appeared "weak, scary and shaky on the *951 death penalty" accepted as race-neutral reason). The record supports that the State's peremptory challenge of Ms. Smith was based on substance and not race.
Defendant's assignments of error alleging Batson errors all fail on the merits.

Assignment of Error 39
In this assignment of error, defendant contends that the state failed to rebut the presumption of prejudice arising from ex parte contacts with family members of one of the victims. Specifically, defendant points to the voir dire of panel five, when 11 jurors had been provisionally selected and sequestered. During the State's preliminary inquiries about the jurors' opinions on capital punishment, one prospective juror, Charline Jacobsen, indicated: "I have a problem that I don't want to talk about in here." The parties relocated to chambers and Ms. Jacobsen stated the following:
Ms. Jacobsen: When I was sitting in the waiting area, there was a man that pulled his chair up besides me, I  just speaking of him  you know, I didn't want the cause of any problems. I asked him what group he was in, and he said, he wasn't, that he was the father of one of the girls.
Ms. O'Bannon: Did he say anything else?
Ms. Jacobsen: That he felt like the guy was guilty, and he has no remorse.
Ms. O'Bannon: When was that, today?
Ms. Jacobsen: Yeah. It kind of scared me.
Ms. O'Bannon: Was anyone else there?
Ms. Jacobsen: I don't feel like I could be fair to the man.
Ms. O'Bannon: Were you speaking to him alone?
Ms. Jacobsen: I was sitting there, and there was other people down the bench. I don't think they heard, and he said it to me, and so it kind of scares me, and I don't feel I could be fair knowing that he said this to me. And he said he was flying back tonight and it was his daughter, Jackie, that was murdered.
Thereafter, Ms. Jacobsen was excused for cause and the defense moved for a mistrial. The defense stated that they did not know whether he talked to any other prospective juror. The prosecutor responded that she did not believe that the victim's father had intentionally attempted to influence the jurors, and that he is "old and deaf."
The court did not rule on counsel's motion for mistrial at that time, but agreed that it would be necessary to query the 11 provisionally accepted jurors. As for the procedure for interviewing the 11 jurors individually, the court determined that it would travel to their hotel, as opposed to transporting those 11 jurors back to court. However, the court decided to finish first voir dire of panel five, including an individual interview of each of those prospective jurors as to whether they had been approached or influenced, and afterwards, court would reconvene at the hotel. After completing the individual interviews with the prospective jurors in panel five, the court dismissed all jurors from panel six who were seated in the courtroom and ordered them to return the following morning, indicating that a "situation has arisen in this particular case." At that point, general voir dire resumed for panel five. Apparently, the individual interviews with the provisionally selected 11 jurors was conducted off the record, as those transcripts were never produced to this court.[13]
*952 La.C.Cr.P. art. 775 provides in part that "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771." As a general matter, mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant. State v. Smith, 430 So.2d 31, 44 (La.1983); State v. Wilkerson, 403 So.2d 652, 659 (La.1981) (mere possibility of prejudice is not enough to warrant mistrial). In addition, a trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial. State v. Sanders, 93-0001, pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288-89; State v. Wingo, 457 So.2d 1159, 1166 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985).
"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is ... deemed presumptively prejudicial. . ." Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425 at 426, 98 L.Ed. 654 (1954). If a defendant is able to demonstrate, by a preponderance of credible evidence, through juror testimony, that the juror was exposed to extrinsic evidence, a presumption of prejudice becomes operative which can be overcome by showing that the error was harmless. J. Weinstein & M. Berger, Weinstein's Evidence, 606.05[3][a], pp. 606-55, 606-56 (citations omitted). Once the defendant has established that an extraneous influence was present in the jury room, the burden shifts to the state, which may present evidence to rebut the presumption of prejudice. See State v. Wisham, 371 So.2d 1151 (La. 1979); State v. Sinegal, 393 So.2d 684, 686-87 (La.1981) (presumption of prejudice when jurors consulted a superseded law book during deliberations); State v. Marchand, 362 So.2d 1090 (La.1978) (presumption of prejudice when bailiff communicated prejudicial information to jurors).
The present case does not suggest that the jury was tainted. While the comments by a victim's father to prospective juror Charline Jacobsen were improper, the taint appears to have been limited exclusively to Ms. Jacobsen, and the court promptly excused her for cause. None of the jurors on the remaining panels at the courtroom that day indicated, when interviewed individually, that they had been approached or had been influenced by any outside sources. While the transcript of voir dire is incomplete as to whether the 11 provisionally selected jurors were ever queried on this score, the likelihood that any of those jurors, sequestered at the hotel, came into contact with the victim's father appears remote, and no taint has been demonstrated.[14] To order a new trial, as appellate counsel suggests, on the attenuated possibility that those 11 jurors had been tainted is not warranted. Telling is the fact that trial counsel never pressed the court for a ruling on her motion for mistrial on this issue, or ever renewed her objection. Defendant fails to demonstrate that taint infected the jurors chosen to decide his case. The entire episode appears to have been extremely limited and properly contained by the court. This assignment of error fails on the merits.

*953 Guilt Phase

Assignments of Error 42-47
In these assignments of error, defendant argues that the state presented insufficient evidence of first degree murder. Defendant claims that the state failed to demonstrate that he had the specific intent to kill or inflict great bodily harm. He further claims that the state did not negate the reasonable hypothesis that James Dunn shot both of the guns. Finally, relying on the testimony of Earline Simoneaux, defendant asserts that both women were alive when he exited the building and before the shots were fired.
In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove . . . must exclude every reasonable hypothesis of innocence." La. R.S. 15:438; see State v. Jacobs, 504 So.2d 817, 820 (La.1987) (all direct and circumstantial evidence must meet the Jackson test); State v. Porretto, 468 So.2d 1142, 1146 (La.1985) (La. R.S. 15:438 serves as an evidentiary guide for the jury when considering circumstantial evidence).
Under La. R.S. 14:30(A)(1) and (3), first degree murder is defined as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of certain felonies including, in this case, armed robbery and aggravated arson; and when the offender has the specific intent to kill or inflict great bodily harm upon more than one person. The burden to prove these elements rested on the State, along with the burden to prove the identity of defendant as the perpetrator. In meeting that burden, the State presented evidence against defendant which established that he specifically intended to and did in fact kill two women while involved in the perpetration of armed robbery and attempted aggravated arson.
The state proved its case against defendant through the testimony of witnesses. First, Detective Michael Brown testified that he responded to a silent alarm, which indicated that the Iberville Bank was being robbed. Detective Brown explained that he entered the bank and called out, "Sheriff's Office-is everything okay?" but got no response. He stated he detected a strong odor of gasoline, and could hear a gurgling sound coming from the branch manager's office. There, Detective Brown observed both tellers lying in pools of blood. Lisa Dupuis was dead on the scene, but Jackie Blanchard was gasping for air.[15] The detective called for assistance and an ambulance. He gave the description of the green car he had seen leaving the bank when he arrived, with three black males in it, traveling north on LA 1.
Law enforcement personnel from both Assumption Parish and Ascension Parish set up a roadblock, but the green car drove through the roadblock. As police vehicles chased the green car at speeds exceeding 80 mph, the vehicle approached a blind curve, and crashed headlong into a passing train. Officers observed two black males, the driver and front seat passenger, exit *954 the vehicle and run alongside the train, escaping under a trestle.
Other officers approached the injured back seat passenger, and ordered Kendall Breaux out of the disabled car. After arresting Breaux, the officers cataloged and collected a quantity of evidence from the car, including bank bags marked Iberville Bank with bundles of cash inside totaling $2,650; a white t-shirt from the passenger-side front seat which was wet with blood; a white plastic grocery bag containing cash on the driver's side rear seat; a Diebold VCR, with security tape inside, on rear driver's side; a Motorola pager found on the driver's side floorboard, alongside a white baseball cap. Loose paper money was found on the ground outside the heavily damaged green car.
Officers continued to search for defendant and James Dunn, who fled on foot after the train collision. Witnesses at nearby CF Industries observed the pair trespassing on the plant's property, and noticed them laughing with one another. Shortly thereafter, officers located defendant and Dunn hiding in a sugar cane field.[16] Defendant was lying on his back, wearing knee-length blue jeans with a white tshirt tucked under his arm, and wearing only one black shoe.[17] On his person, defendant had approximately $1,250. The arresting officers observed no injuries, bleeding or bruising on any part of defendant's body. Dunn had four dollars on his person at the time of his arrest. The officers located over $3,000 in the cane field, and nearby they found a large caliber revolver.[18] Dunn's 9 mm weapon was located near the crash scene in some grass off LA 70.
The forensic pathologist who conducted the autopsies of Lisa Dupuis and Jackie Blanchard testified that both women had been shot three times.[19] All three of Lisa's wounds were consistent with a 9 mm weapon, whereas Jackie Blanchard suffered a gaping entrance wound, with irregular margins, to the right side of her head that was consistent with a large revolver shooting much smaller ammunition.[20] The doctor measured that wound to be 1.9 centimeters at its greatest diameter.[21] The irregular wound to the right side of Jackie's head was a fatal wound.
Crime scene investigators retrieved ballistic evidence indicating that at least two weapons were fired inside the Iberville Bank. The officers seized four 9 mm bullets, *955 and five 9 mm shell casings from the bank. Officers also collected two lead bullets from the bank: one was a 38 caliber Smith and Wesson bullet and the other was a .357 magnum caliber cartridge. The crime lab expert testified that all of the lead bullets were fired from a different caliber weapon than they were made for. The expert further testified that he examined the .401 magnum, single action revolver seized from the cane field, which is a 40 caliber weapon and is larger than the 38 and .357 caliber ammunition found in the bank. Thus, he determined that the ammunition would fit loosely in the revolver. The expert examined the ammunition remaining in the revolver and testified that those lead bullets were "re-load" bullets, a less expensive type of ammunition. The.401 caliber revolver was made in West Germany and was over 50 years old. Consequently, ammunition made for that gun is not sold in stores anymore. One of the lead bullets penetrated the bank's floor, and embedded in the nose of that bullet was a long black hair consistent with that of Jackie Blanchard. Finally, the crime lab observed visible gasoline droplets on the desks, the teller area, and the computers. Gasoline had also been slung in the video closet of the branch manager's office. The crime lab seized a Prestone Antifreeze container and several unstruck safety matches were found on the bloodstained floor. No matchbox with a striking surface was found.
The VCR that was taken from the bank contained the security tape. The tape was shown to the jury and depicted defendant and James Dunn entering the bank at approximately 11:40 a.m. Defendant was wearing a white tee shirt and knee-length blue jeans and Dunn had on a predominantly white Nike shirt, with striping across the chest, and a white baseball cap. Dunn is seen leaving the bank briefly, while defendant waited inside. Upon re-entering the bank, Dunn immediately pulled a 9 mm weapon on Lisa Dupuis behind the teller counter. Simultaneously, defendant retrieved a large caliber revolver from his waistband and pointed it directly at Jackie Blanchard's head, who was seated at a desk in the front of the bank. The cameras captured Dunn as he leaped over the teller counter. Defendant can be seen escorting Jackie at gunpoint to behind the teller line, where the cash drawer and vaults were located. Defendant can be seen retrieving money from the cash drawer together with Jackie, while Dunn is seen guarding Lisa, off to the side. At 11:43 a.m., Kendall Breaux is seen entering the bank carrying a container. Moments later, the video captured Breaux as he poured gasoline all over the teller line. Next, the video recorded Breaux as he poured gasoline all over Jackie's desk area. Thereafter, the screen went black.
Defendant gave custodial statements following his arrest to Ascension and Assumption Parish Sheriff's deputies, and to two F.B.I. agents. In those statements, defendant acknowledged being inside the Iberville Bank on June 4, 1998. Defendant initially claimed ignorance of the plan to rob the bank, but once he learned the officers had seized the video tape, he admitted that he had entered the bank with a.32 caliber p-shooter, but denied ever firing the gun.
The F.B.I. analyzed the VCR for fingerprints, and found three fingerprints that matched Kendall Breaux, and one palm print that matched defendant. The serology expert from the Louisiana State Police Crime Lab analyzed the blood stains found on the white t-shirt defendant was seen wearing in the video, and which was later seized from the front passenger seat of the green car. The expert testified that the blood evidence on defendant's shirt *956 matched the sample taken from Lisa Dupuis.
Earline Simoneaux testified that she drove into the parking lot of the Iberville Bank, and after parking next to the green Pontiac Sunbird, she changed her mind and decided to drive through the drive-up window. She noticed that the blinds were down at the teller window, and she could not see anyone. She waited, but no one came to help her. Just as she was about to press the teller button, she saw two black males run out of the bank. She then heard two gunshots, followed by a third gunshot. After that, Ms. Simoneaux observed a black male wearing a white baseball cap exit the bank, glancing over in her direction. Ms. Simoneaux observed the police coming, and she gave the police her statement and a description of the men she had seen.
Although defendant did not testify, he used Simoneaux's testimony to suggest that he was not the shooter, and that both women were alive when he exited the bank. However, having heard only three shots, Ms. Simoneaux clearly could not have been present to hear all of the shots fired, since each victim was shot three times. In addition, the ballistic evidence suggests that one gun was fired at least five times and another gun was fired at least two times.
The evidence suggested overwhelmingly that defendant entered the bank with the intent to kill or inflict great bodily harm, and that he did in fact do that during the perpetration of an armed robbery and attempted aggravated arson. Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found beyond a reasonable doubt that the state established all of the elements of first degree murder, and defendant's identity as the perpetrator.
Defendant's sufficiency claims fail on the merits.

Assignment of Error 52
In this assignment of error, defendant avers that the State violated his right to due process of law when it argued that defendant killed Lisa Dupuis and Jackie Blanchard after it convinced another jury that James Dunn killed the same victims. Defendant argues that the "state took opposite positions of fact, proving in James Dunn's case that Dunn killed Lisa Dupuis and Jackie Blanchard, and then claiming that Anthony Scott killed them in this case."
Appellate counsel points to the recitation of facts in this court's opinion in the capital case of co-defendant, James Dunn, which read, in part, as follows:
A bank customer, Earline Simoneaux, arrived at the drive-up teller window at the same time and noticed that the blinds were drawn, but the slats were open. She peered through the slats and saw two black males running out of the side office. Ms. Simoneaux testified that just as she started to ring the teller call button and just after the two black males bolted through the front door of the bank, she heard a gunshot, and then moments later, two more gunshots. She then saw a black male wearing a white cap run out of the office. He glanced back at her as he ran. Ms. Simoneaux then drove to the side of the bank where she saw a green Pontiac Sunfire drive out of the parking lot. . . . Ms. Simoneaux was certain that the defendant, who was wearing a white hat, had been the perpetrator. He was the one who had fired the shots after the other two black males had left the bank. . . . Further investigation revealed that both women were shot multiple times in the head and upper body. Bullets and empty casings that matched the defendant's *957 9mm weapon were found under and around the victims' bodies. . . . Jurors also had to judge for themselves the credibility of Ms. Simoneaux's testimony that the other two perpetrators had just reached the outside of the bank when the shots rang out from the inside office. Defendant [Dunn], wearing a white cap, then exited the bank. The distinguishing element between first and second degree felony murder turned on whether jurors believed Ms. Simoneaux's identification of the defendant as the whitecapped shooter, not on the question of who instigated and led the bank robbery.
State v. Dunn, 01-1635, pp. 2-6, (La.11/1/02), 831 So.2d 862, 865-68.
Defendant suggests that the State's position in Dunn bound it to an irretrievable commitment to a theory of the case which negates his culpability for the same murders. Accordingly, he claims a due process violation in his own case when the State, in its closing argument at his guilt phase argued the "opposite" position:
Anthony Scott specifically intended to kill or inflict great bodily harm on Lisa Dupuis, Anthony Scott specifically intended to kill or inflict great bodily harm on Jackie Blanchard while he was in the perpetration of an armed robbery.
As a general matter, due process forbids a State from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event. Smith v. Groose, 205 F.3d 1045, 1048-49 (8th Cir.2000), cert. denied, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000)(convictions of accomplices in a murder/robbery were obtained at separate trials through diametrically opposed testimony from a third participant; such manipulation of evidence rendered trial fundamentally unfair and required reversal); cf. Nichols v. Scott, 69 F.3d 1255, 1268-72 (5th Cir.1995)(guilty plea of one co-defendant does not preclude murder prosecution of the other when it could not be determined whose gun caused the fatal wound). In Louisiana, a principal who aids and abets in the commission of a first degree murder may be sentenced to death provided he had specific intent to kill or to inflict great bodily harm upon the victim. State v. Anthony, 98-0406, pp. 11-14 (La.4/11/00), 776 So.2d 376, 385-87; State v. Willie, 436 So.2d 553, 557-58 (La.1983).
The prosecutor in this case, who tried both James Dunn and Anthony Scott, did not make a division of culpability. Rather, at the conclusion of both Dunn's and Scott's separate trials, the prosecutor argued each offender's specific intent to kill or inflict great bodily harm, in keeping with the elements of La. R.S. 14:30. Such argument does not present inconsistent theories of defense. Never did the instant prosecutor suggest that Dunn was more culpable than Scott, or vice versa.
Nothing the State articulated in James Dunn's case exonerated or exculpated Anthony Scott, as he and Dunn were principals to the same crimes. The State's opening statement and closing arguments at Dunn's guilt phase focused primarily on the actions of James Dunn, as he was the only defendant on trial in that case. In the State's opening statement at the guilt phase of Dunn's capital trial, the prosecutor expressed to the jurors the same sentiment she claimed in defendant's trial, "And the state is going to prove to you, beyond a reasonable doubt, that James Dunn had the specific intent to kill Lisa Dupuis, and he had the specific intent to kill Jackie Blanchard, while in the perpetration of an armed robbery." Contrary to defendant's arguments, there is nothing "opposite" about arguing each perpetrator's specific intent in his separate trial. *958 As a principal with James Dunn, the State charged defendant, Anthony Scott, as acting in concert with James Dunn. As such, the State had to demonstrate that defendant had the requisite specific intent, not merely that he knew of Dunn's intentions. In support of the State's principals theory, the prosecution demonstrated that the ballistic evidence retrieved from inside the bank included four 9mm bullets and five 9mm cartridge casings, as well as two lead bullets which appeared to have been fired from a 40 caliber revolver. Moreover, the forensic pathologist testified that the gunshot wounds to Lisa Dupuis were consistent with a 9mm weapon, whereas the wound to the right side of Jackie Blanchard's head was smaller, yet irregular, and consistent with a revolver. Thus, the jury was free to recall the bank surveillance photos showing defendant holding a .401 magnum revolver to Jackie Blanchard's head, which was the gun he used, moments after the surveillance camera shut off, to shoot her, to infer defendant's intent as a willing participant with James Dunn in the lethal bank robbery in which they would leave no witnesses.
In the present case, the state clearly had no personal knowledge of what went on inside the bank and was forced to argue reasonable inferences arising from the evidence presented at trial, the essence of closing argument as opposed to statements incorporating admissions of fact. La.C.Cr.P. art. 774. This court has previously acknowledged that "`a situation in which the prosecutor has adopted such a fundamentally inconsistent position in the separate trials of two co-perpetrators that basic fairness might require the trial court to permit the exposure of the inconsistent positions.'" State v. Lavalais, 95-0320, p. 13 (La.11/25/96), 685 So.2d 1048, 1056 (quoting State v. Wingo, 457 So.2d 1159, 1166 (La.1984)). Accordingly, "when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir.1997). However, in both Wingo and Lavalais, the court distinguished between the State's adoption of mutually exclusive theories of guilt in successive trials of co-defendants and the State's "emphasis on the facts relating to culpability of the particular defendant on trial." Wingo, 457 So.2d at 1166. In the latter case, a due process violation does not occur when "[e]ach defendant had attempted to shift culpability to the other, and the prosecutor in each case simply pointed out to the jury the evidence reflecting on the culpability of the defendant on trial and the reasonable inferences drawn from the evidence." Id. The present case presents exactly that situation when all of the prosecutor's remarks during opening statements and closing arguments in Dunn's capital trial are compared with the opening statements and closing arguments in defendant Anthony Scott's capital trial; no due process violation is demonstrated.
The state's remarks in Dunn's trial did not commit the prosecution and therefore jurors to a single theory of Dunn's guilt for the double murder which diametrically opposed and wholly negated any theory of defendant's legal or moral culpability arising out of his complicity in the murders as a principal "concerned" in the commission of the offense. La. R.S. 14:24. The remarks otherwise constitute mere argument of counsel, their understanding of what the facts showed, and thus, not evidence and not admissions of fact within the personal knowledge of a party opponent and that party's representatives for purposes of La. C.E. art. 801(D)(3)(a). This claim fails on the merits.

*959 Penalty Phase

Assignments of error 59-71
Following his conviction on two counts of first degree murder, defendant was sentenced to death. Defendant appeals his sentence contending that as a mentally retarded offender, he is less culpable than other offenders and that the State is constitutionally prohibited from executing him under the expansion of Eighth Amendment protection in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Finding that the record contains reasonable grounds to doubt whether defendant is mentally retarded and exempt from capital punishment, we remand the matter to the trial court for further proceedings.
In Atkins, the United States Supreme Court held that executing some mentally retarded offenders is prohibited by the Eighth Amendment while leaving to the States the task of developing a means of determining which offenders are sufficiently impaired in intellectual functioning and adaptive skills to be exempt from capital punishment. Atkins, 536 U.S. at 317-18, 122 S.Ct. at 2250, 153 L.Ed.2d 348. In Louisiana, this court implemented the Atkins mandate in State v. Williams, 01-1650 pp. 20-32 (La.11/1/02), 831 So.2d 835 851-60, relying on the definition of mental retardation in La. R.S. 28:381(28), and devising a procedure for remanding Atkins claims for a contradictory hearing before a trial judge similar to that found in La. C.Cr.P. art. 647. Following Williams, the legislature enacted La.C.Cr.P. art. 905.5.1, which prohibits the execution of the mentally retarded, provides procedures for the raising and trying of this issue, and defines mental retardation for the purpose of exemption from capital punishment.
On appeal, defendant contends the record shows by a preponderance of the evidence that he is mentally retarded and exempt from execution. Defendant received special education services throughout his education, which ceased incompleted, and consistently performed below grade level. Defendant failed the fourth grade twice before being administratively promoted to the fifth grade. The record contains several IQ tests of the defendant over his lifespan ranging near the borderline range of intellectual functioning. Defendant has never been employed and has minimal and vague career aspirations. The record contains school records and expert evaluations with a range of opinion as to the defendant's correct diagnosis, school classification for the purpose of receiving special educational services, his strengths, weaknesses, and level of functioning.
The State, however, contends that defendant at one time carried a school classification as learning disabled, which excludes by its definition the possibility that defendant is also mentally retarded. Additionally, the State contends that the evidence of defendant's mental retardation was heard and considered by the jury as a mitigating factor in the penalty phase. The penalty phase, however, was conducted prior to Atkins and the expression of the legislature in art. 905.5.1. Finally, the State describes the defendant's behavior on video during the crime as inconsistent with the claim of mental retardation. Although the defendant's behavior during and following the commission of the crime can be relevant to the determination of mental retardation, see State v. Brown, 03-0897 p. 72 (La.04/12/05), 907 So.2d 1, 32, in light of the clear guidance of art. 905.5.1, it would be premature for this court to make a determination of whether this defendant is mentally retarded and exempted from capital punishment from this record in this appeal.
The summary of evidence on the issue of retardation above is simply illustrative and by no means exhaustive. Given the record in this case, defendant should be afforded *960 the same opportunity as co-defendant James Dunn to have the issue of whether he falls within the protection of the Atkins decision fully heard. See State v. Dunn, 01-1635 pp. 22-30 (La.11/1/02), 831 So.2d 862, 880-86. However, this opinion should in no way be construed as a ruling on the issue of whether the defendant is exempted by mental retardation from capital punishment in accordance with the Atkins decision and La.C.Cr.P. art. 905.5.1, nor should the recitation of facts above be considered conclusive. This full determination in accordance with art. 905.5.1 is the purpose of the remand.
This matter is remanded to the district court for it to conduct a hearing in conformity La.C.Cr.P. art. 905.5.1. We retain jurisdiction for review of the penalty in the event defendant is not determined to be mentally retarded.[22]

Decree
For the reasons assigned, we affirm defendant's conviction for the murders of Lisa Dupuis and Jacqueline Guillot Blanchard. We pretermit review of the penalty phase of defendant's trial and remand to the district court for a hearing in conformity with this opinion to determine whether defendant is mentally retarded.[23]
CONVICTION AFFIRMED. CASE REMANDED FOR EVIDENTIARY HEARING CONSISTENT WITH THIS OPINION TO DETERMINE WHETHER DEFENDANT IS MENTALLY RETARDED.
WEIMER, J., concurs and assigns reasons.
CALOGERO, C.J., and JOHNSON, J., dissent and assign reasons.
WEIMER, J., concurring.
I concur in the determination that affirms the jury's verdict that the defendant is guilty and in the majority's resolution of the various assignments of error. However, as to juror Nina Mears (See slip opinion pp. 38-39), I would find the trial court did not err in finding nothing said by the prospective juror rose to the level to merit granting a challenge for cause. As such, I find it unnecessary to state that a defendant who fails to exercise a peremptory challenge against a potential juror challenged for cause waives his right to assert as error on appeal the denial of the challenge for cause. See State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, Weimer, J. on reh'g.
CALOGERO, Chief Justice, dissents and assigns reasons.
I disagree with the majority decision affirming the defendant's conviction for first degree murder.
With respect to the reverse-Witherspoon challenges, I do not consider Juror James Butler to have been sufficiently rehabilitated by either the trial judge or the prosecutor. The trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686-87. However, "a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment *961 according to the law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). This court has explained that a potential juror who indicates that he will not consider a life sentence, but will instead automatically vote for the death penalty under the particular factual circumstances of the case before him, is subject to a challenge for cause. State v. Maxie, 93-2158, p. 23, 653 So.2d 526, 538; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1284. Mr. Butler's voir dire answers as a whole indicate that in this case he would not have considered a life sentence if the defendant were to be found guilty of first degree murder.
Furthermore, at no time during voir dire did Mr. Butler say that he could seriously consider imposing a sentence of life imprisonment rather than death if this defendant were proved guilty of the aggravating circumstances. It is well-settled in our jurisprudence that the failure to disqualify a venire person unable to consider both life and death as penalties constitutes reversible error. State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320 (death penalty reversed because two jurors would not consider a life sentence when the particular case involved a premeditated murder); Maxie, 93-2158, 653 So.2d 526 (death penalty reversed because a juror would not consider a life sentence when the particular case involved a rape and murder); Robertson, 92-2660, 630 So.2d 1278 (death penalty reversed where a venire member stated his opinion that death was appropriate sentence for a double murder, even though he also stated he could perform his duties according to the judge's instructions); State v. Ross, 623 So.2d 643 (La. 1993) (first degree murder conviction reversed because a venire member said he could "consider" both the death penalty and life imprisonment, but "personally" would "vote" for capital punishment as "the only penalty in a murder trial").
As even the majority must concede, this juror's responses exhibited a steadfast predisposition in favor of the death penalty. Yet, when queried by the trial judge, Mr. Butler at most gave only tepid assurances that he could follow the law and consider any mitigating circumstances before making his decision whether to impose the death penalty. In my view, Mr. Butler thus never abandoned his position that the only appropriate sentence for a person guilty of first degree murder was the death sentence. The trial judge should have recognized that, based upon the totality of his responses during voir dire, Mr. Butler's stance on the imposition of the death penalty substantially impaired his ability to follow the law as provided under Louisiana's capital sentencing scheme.
The risk that the trial judge's denial of the defendant's challenge for cause of Mr. Butler might have "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." Morgan v. Illinois, 504 U.S. 719, 736, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (internal quotations omitted). That risk multiplied when Mr. Butler was actually seated on the jury after the trial judge granted the state's reverse-Batson challenge to the defendant's use of a peremptory strike against the juror. Consequently, defense counsel's apparently careless response to the state's challenge raises the possibility that the defendant was denied the effective assistance of counsel.
Not surprisingly, my second concern with the majority opinion involves the defendant's claim that he was denied the right to the counsel of his choice. I believe the trial judge abused his discretion in removing appointed counsel Mr. Leary from the case at Ms. Jones's request and over the vehement objection of the defendant. First, the majority opinion implies, *962 without any factual basis in the record, that the defendant manipulated his right to counsel to obstruct the orderly procedure of the courts and to interfere with the administration of justice. Ante, pp. 919-20. Second, the defendant's complaints with regard to Ms. Jones were supported by the statements of both Mr. Leary and, ultimately, Ms. Alex, the attorney Ms. Jones selected to replace Mr. Leary. Ms. Alex's statements established that the defendant had legitimate grievances regarding Ms. Jones's representation. Third, the record suggests that the trial judge could just as easily have retained Mr. Leary in the case and replaced Ms. Jones as lead counsel with Mr. Petit, as proposed by Mr. Leary. Accordingly, I discern no just cause in this record for removing from the case the attorney in whom the defendant had placed his trust at the request of the attorney against whom the defendant had lodged well-founded complaints. Indeed, counsel's lackluster performance during voir dire and trial suggests that the defendant's complaints may have been prescient. Were this court to reverse the defendant's conviction on the juror issue, the defendant could be retried with different counsel and eliminate any doubts about whether he was afforded his right to counsel.
For these reasons, I respectfully dissent.
JOHNSON, J., dissents and assigns reasons:
The defendant in a capital case is entitled under the Sixth and Fourteenth Amendments to an impartial jury in both the guilt and the penalty phase. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 1191 L.Ed.2d 492 (1992). The party seeking to exclude the juror has the burden to demonstrate, through questioning, that the juror lacks impartiality. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879). The key to deciding cause challenges against prospective jurors based on theirs views in favor of or against the death penalty is the determination of impartiality. Perhaps the most difficult tasks for the trial judge in ensuring the impartiality of a capital jury are; (1) handling the death qualification portion of the voir dire and (2) ruling on challenges for cause to a prospective juror who has expressed his or her views toward the death penalty.
I believe that the trial court erroneously denied the challenge for cause as to juror James Butler. During voir dire, Butler made it clear that "anyone who shoots and kills another person should receive the death penalty". Juror Butler never abandoned his opinion that the only appropriate sentence for a person guilty of murder was death sentence.
The seminal decision on the death qualification of prospective jurors was Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in which the Court examined an Illinois law that authorized a cause challenge for jurors who voiced general misgivings about the death penalty. Based on that statute, nearly half of the veniremen in the case had been excused for cause. Rejecting the broad statutory authorization for challenging jurors with "conscientious scruples against capital punishment," the Court reversed the death penalty. The Court held that this statutory procedure did not result in an impartial jury as required by the Sixth Amendment, but resulted instead in a jury "uncommonly willing to condemn a man to die." Id. at 521, 88 S.Ct. 1770. The Court emphasized that veniremen cannot be excluded for cause simply because they indicate there are some kinds of cases in which they would refuse to recommend capital punishment, and that a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him.
*963 The Witherspoon decision thus involved the issue of a limitation on a state's power to exclude jurors, rather than the issue of the appropriate grounds for challenging capital jurors. However, the Court in a footnote indicated that nothing in the decision prevented approval of a death penalty imposed by a jury from which were excluded only "those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . . ., or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. at 522-23 n. 21, 88 S.Ct. 1770 (emphasis in original).
In Louisiana, a juror in a capital case must be willing to consider the imposition both of a death sentence and of a life sentence, based on all of the evidence and on the instructions given by the trial judge. At the conclusion of the evidence, a juror must find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, and then must consider any mitigating circumstances (statutory or otherwise) before determining whether or not the death sentence should be imposed. La.Code Crim. Proc. art. 905.3. See Blystone v. Pennsylvania, 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)("[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence."). While a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence, the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant (which is the focus of a capital sentencing hearing) and must be willing to fairly consider a life sentence. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In the instant case, the State cannot argue that Juror Butler, stated a willingness to consider life, even in the abstract, because the jurors were never asked that specific question. Juror Butler was never queried as to whether he could seriously consider the sentence of life imprisonment, which is the law. State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280. Here, the trial judge sought to take an active role in voir dire. What should have been asked was "Can you likewise return the sentence of life imprisonment without benefit of parole, probation, or suspension of sentence?" The omission of this query is error patent with a pro-death juror like Butler. Under these circumstances, where Butler actually served on the jury that sentenced the defendant to death, the defendant was forced to accept an obnoxious juror.
For the foregoing reasons, I dissent from the majority opinion.
NOTES
[1] Defendant's assignments of error that are not treated in the main body of this opinion will be reviewed in an unpublished appendix which will comprise part of the record in this case.
[2] James Dunn was convicted and sentenced to death for the instant offenses in separate proceedings in March 1999. On appeal, this court affirmed Dunn's conviction for two counts of first degree murder, but remanded the matter for additional proceedings in light of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). See State v. Dunn, 01-1635 (La.11/1/02), 831 So.2d 862.
[3] On October 12, 1999, Kendall Breaux pled guilty to two counts of first degree murder and was sentenced to two consecutive terms of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
[4] The full name of the location is Iberville Trust and Savings Bank, but it is referred to throughout the record as "Iberville Bank."
[5] The office was the workspace of branch manager Terry Blanchard, but he was not at the bank that particular morning.
[6] The motion and order were not filed into the record of the court until several days after March 5, 1999, but it appears clear that the court's order was signed on March 5.
[7] La.C.Cr.P. art. 831, which provides those instances in which a defendant charged with a felony shall be present, states:

A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
(1) At arraignment;
(2) When a plea of guilty, not guilty, or not guilty and not guilty by reason of insanity is made;
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
(6) At the rendition of the verdict or judgment, unless he voluntarily absents himself.
B. Nothing in this Article shall prohibit the court, by local rule, from providing for a defendant's appearance at his arraignment by simultaneous audio-visual transmission, except when the defense counsel requests the defendant's appearance in open court.
[8] Subsection (2) of La.C.Cr.P. art. 797 states in its entirety:

The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
[9] La. R.S. La.C.Cr.P. art. 798(2)(a) and (b) provide:

It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
* * *
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; ...
[10] The "substantial impairment" standard applies to reverse-Witherspoon challenges. Manning, 03-1928 at p. 38 n. 22, 885 So.2d at 1083 n. 22; State v. Carmouche, 01-0405, pp. 10-11 (La.5/14/02), 872 So.2d 1020, 1029-30. In Morgan v. Illinois, 504 U.S. 719, 738-39, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id. The Morgan Court adopted the Witt standard for determining if a pro-death juror should be excused for cause.
[11] The State counters that 100% of the defense peremptory challenges were exercised against whites.
[12] At this point, the state had exercised one other peremptory strike which was against Cora A. Ford, a black female.
[13] By its omission, appellate counsel surmises that the individual voir dire of the provisionally accepted 11 jurors never took place. While that scenario is possible, the fact that the judge and the parties discussed and planned on going to the hotel makes it just as likely that the interviews occurred, but were not recorded.
[14] The state concedes that no transcript of the individual voir dire of the 11 provisionally selected jurors was ever made a part of the instant record.
[15] Jackie Blanchard died en route to the hospital.
[16] One officer testified that the cane had not been cut and stood approximately three to four feet in height.
[17] Officers located the mate to defendant's black shoe in the cane field. The imprint of this right Nike Air shoe was matched to a shoe print found on papers behind the teller counter at the Iberville Bank.
[18] The revolver was located in close proximity to defendant's black shoe.
[19] Lisa Dupuis suffered one gunshot wound to the back of her head. A second gunshot entered Lisa's right posterior shoulder, traveled up the spinal column to the left forehead, destroying a large portion of her brain. The third wound entered at Lisa's right arm pit, passed through the diaphragm, liver, and right kidney, exiting the body at the midline of the back.
[20] In addition, Jackie suffered a gunshot wound to the baseline of the back of her neck, and a wound to her lower left arm.
[21] The doctor explained that the irregular entrance wound was caused by a bullet which had lost its circumferential pattern and was tumbling when it struck the skin. The doctor further noted that under circumstances when small ammunition is placed in a larger caliber weapon, the bullet begins to wobble or "yaw" as it passes through the barrel. When that occurs, the bullet strikes the skin in an irregular pattern of entrance and exit wounds.
[22] If it is determined that defendant is mentally retarded and the State chooses to appeal that determination, this court remains the proper forum for that appeal. See La.C.Cr.P. art. 913; Dunn, 01-1635 at p. 31 n. 11, 831 So.2d at 888 n. 11.
[23] We also pretermit review of defendant's assignment of error number 84 as it relates to both the guilt and penalty phases of defendant's trial.